IN THE SUPREME COURT OF NORTH CAROLINA

No. 132PA18-2

Filed 14 August 2020

BETH DESMOND

v.

THE NEWS AND OBSERVER PUBLISHING COMPANY, MCCLATCHY NEWSPAPERS, INC., and MANDY LOCKE

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 263 N.C. App. 26, 823 S.E.2d 412 (2018), affirming the order and judgment entered 18 November 2016 and the order entered 30 January 2017 by Judge A. Graham Shirley in Superior Court, Wake County. Heard in the Supreme Court on 4 November 2019.

*Dement Askew & Johnson, by James T. Johnson and Chynna T. Smith, for plaintiff-appellee Beth Desmond.*

*The Bussian Law Firm, PLLC, by John A. Bussian, McGuire Woods, by Bradley R. Kutrow, and Brooks, Pierce, Mclendon, Humphrey & Leonard, L.L.P., by Mark J. Prak, Julia C. Ambrose, and Timothy G. Nelson, for defendant-appellant The News and Observer Publishing Company, Tharrington Smith L.L.P., by Wade M. Smith, for Mandy Locke.*

*Essex Richards, P.A., by Jonathan E. Buchan, for The Reporters Committee for Freedom of the Press, et al., amici curiae.*

*Wyche, PA, by William M. Wilson, III, for Professor William Van Alstyne, amicus curiae.*

EARLS, Justice.

Plaintiff, Beth Desmond, filed a complaint alleging defamation on the part of defendants, the News and Observer Publishing Company (the N&O) and reporter

Mandy Locke, arising out of a series of articles published by defendants in 2010. Following a trial, in which the jury found defendants liable for defamation and awarded plaintiff compensatory and punitive damages, defendants appealed. On appeal, the Court of Appeals affirmed the trial court's order and judgment, concluding that plaintiff presented clear and convincing evidence of actual malice and that there was no error in the jury instructions. *Desmond v. News & Observer Pub. Co.*, 263 N.C. App. 26, 67, 823 S.E.2d 412, 438–39 (2018) (*Desmond II*). We affirm in part and reverse in part.

## Background

Plaintiff's defamation claim arises out of a series of articles published by defendants in 2010 entitled "Agents' Secrets," which reported on alleged problems within the North Carolina State Bureau of Investigation (the SBI) that purportedly led to wrongful convictions. Plaintiff was at that time a Special Agent with the SBI serving as a forensic firearms examiner, which is a "discipline in forensic science" mainly concerned with "comparing cartridge cases and bullets and other ammunition components." In the final article of the four-part "Agents' Secrets" series, defendants reported on and were critical of plaintiff's work in two related criminal cases in Pitt County. *See generally State v. Green*, 187 N.C. App. 510, 653 S.E.2d 256, 2007 WL 4234300 (2007) (unpublished); *State v. Adams*, 212 N.C. App. 235, 713 S.E.2d 251, 2011 WL 1938270 (2011) (unpublished).

Charges in both cases originated from a confrontation that occurred on 19 April 2005 in Pitt County. Two groups of women engaged in a series of verbal altercations over the course of an afternoon that ultimately culminated with multiple gun shots and one bullet striking a ten-year-old child, Christopher Foggs, in the chest. Foggs died from the gunshot wound at the hospital later that evening. *Desmond II*, 263 N.C. App. at 31–33, 823 S.E.2d at 418–19.

Jemaul Green, who drove his girlfriend, Vonzeil Adams, to the scene of the incident, was indicted for multiple offenses, including first-degree murder. His trial took place in 2006. In support of its case, the State presented testimony from twelve eyewitnesses to the shooting. Green testified on his own behalf and asserted that when he drove to the Haddock house he had in his possession a 9mm handgun that he had illegally purchased and that he took it with him that day out of concern for his own safety.[1] Green testified that during the incident he saw an unknown black male in between the Haddock house and a neighboring house standing closely behind a car—a "black Neon"—and that this man fired a handgun in Green's direction, prompting Green to return fire in self-defense. According to Green, Adams then snatched the gun from him and fired additional shots at the Haddock house before they both got back in the car and left the scene. None of the State's twelve eyewitnesses observed anyone at the scene with a gun other than Green. Green's

---

[1] Green testified that one of the women riding in the car with him and Adams to the Haddock house had a Taser and that another of the women had a sword.

own witness Victoria Gardner testified that she was standing in between the houses, that she did not see anyone near the black Neon, that she did not hear any shots other than those coming from Green, and that she did not see anyone with a gun other than Green.

The State also presented evidence concerning eight fired cartridge casings and six bullet fragments recovered from the scene. The casings were found "in a fairly small circle" next to a tree where Green had been standing when he fired his 9mm handgun, and the bullet fragments were found "in a very tight pattern" leading from Green's location. The State also presented testimony from plaintiff, who had been assigned by the SBI to the case and who performed microscopic comparison analysis of the cartridge casings and bullet fragments. The prosecutors in the case originally sent only the cartridge casings to the SBI's crime lab for analysis, mistakenly assuming that the bullet fragments had no forensic value. When plaintiff arrived in Pitt County to testify and learned that bullet fragments had also been recovered from the scene, she discussed with the prosecutors whether they wanted the bullets examined as well. The prosecutors decided that they did want the bullets examined, and the trial judge rescheduled plaintiff's testimony for the following day so that plaintiff could perform an examination of the bullets. Accordingly, plaintiff returned to the crime lab that day, performed an examination of the six bullet fragments, and compiled a report of her examination. Plaintiff's work was reviewed by her senior

supervisor, Neal Morin, who examined the bullets under a comparison microscope and arrived at the same conclusions as plaintiff.

On the following day, plaintiff returned to Pitt County to give her testimony. Plaintiff opined that the eight cartridge casings had been fired from the same gun and that the gun was a Hi-Point 9 millimeter semiautomatic pistol. Regarding the bullet fragments, plaintiff opined that while four of the bullets were too damaged to have any forensic value, two of the bullets were fired from the same *type of gun*, a Hi-Point 9 millimeter semiautomatic pistol, but she could not conclusively determine whether the bullets were fired from the same gun. Plaintiff's analysis involved examining the "class characteristics," or "rifling impressions," which are the "lands and grooves" (i.e. ridges and impressions) that are left on a bullet as it travels through the barrel of a gun.[2] Plaintiff determined that the class characteristics of the two bullets were the same—"nine lands and grooves with a left hand direction of twist down the barrel." Because only one manufacturer makes their guns "9-left," plaintiff was able to determine that the type of gun was a Hi-Point Model C.

---

[2] Firearms examiners also analyze "individual characteristics," which "come[ ] from the markings that are inside the gun" and "that are actually imparted to the firearm during the manufacture." Plaintiff explained that "when the manufacturer makes the gun the tools that are used to make the gun are harder than the metals of the gun itself and so those tools would leave unique markings, irregularities, random markings on the internal part of the gun, so every place that that cartridge, the soft metals of that ammunition comes in contact would be a potential for us to look at it as a firearms examiner for this unique individual detail." Plaintiff's determination regarding the individual characteristics was "inconclusive."

After plaintiff had testified regarding her forensic examination of the cartridge casings and the bullet fragments, the prosecutor sought to have plaintiff hold a semiautomatic handgun (unloaded) and explain to the jury where the "ejection port" is and how it operates to eject the cartridge casing each time the gun is fired. During a brief *voir dire* examination by defense counsel while the jury was in recess, plaintiff stated with "absolute certainty" that the two bullets came from a 9mm Hi-Point firearm. Following a court recess, the prosecutor had plaintiff hold a 9mm Hi-Point model C handgun to explain how the ejection port in a semiautomatic handgun works.

Green was ultimately convicted of second-degree murder, as well as multiple counts of discharging a weapon into occupied property and assault with a deadly weapon. Green appealed on grounds unrelated to the ballistics evidence, and on appeal the Court of Appeals upheld his convictions. *Green*, 2007 WL 4234300, at *2, *6–*7.

Vonzeil Adams was also indicted for first-degree murder and other offenses in connection with the shooting; her trial took place in 2010.[3] Before trial, Adams's defense attorney, David Sutton, filed a motion seeking to preclude the State presenting plaintiff's expert testimony at trial. The motion was affixed with an extensive affidavit from Adina Schwartz, a professor at the John Jay College of Criminal Justice, in which Schwartz challenged the scientific reliability of firearms

---

[3] A mistrial was declared in Adams' initial trial in 2009, and the second trial took place in April of 2010.

examination, as well as the SBI's firearms examination protocols and plaintiff's documentation. The trial court denied this motion and plaintiff again testified regarding her opinions concerning the cartridge casings and bullet fragments.

Near the end of the *Adams* trial, Sutton, with permission of the trial court, asked another local attorney, Fred Whitehurst, to take photographs of the two bullet fragments about which plaintiff had testified. Whitehurst, a former FBI chemist, had no training in firearms examination, but he owned a microscope with the capacity to take photographs. Whitehurst and Sutton emailed the resultant photographs (the Whitehurst Photographs) to other attorneys, including one attorney representing an as of-yet untried co-defendant of Vonzeil Adams, and other individuals interested in firearms examination, including Schwartz. The Whitehurst Photographs, including one photograph in particular (the Comparison Photograph) in which the bullets are posed back-to-back, or "base-to-base," raised questions among those circulating the photographs because they could not perceive any matching class characteristics in the two bullets. Based largely on these photographs, Sutton filed a motion for mistrial.

In the motion, Sutton alleged that the photographs "clearly show that the 'lands and grooves' in Q-9 and Q-10[, the two bullet fragments,] are distinctly dissimilar." Additionally, Sutton asserted that "[t]he photographs have been sent to William Tobin, formerly of the FBI laboratory for analysis," and that Tobin had stated that " 'preliminary' [sic] based upon a photograph sent by Dr. Whitehurst there is

ample reason to question whether the class characteristics in Q-9 and Q-10 are the same."[4]  The trial court denied the motion for mistrial.  Adams was convicted—under an aiding-and-abetting theory—of one count of voluntary manslaughter, three counts of discharging a firearm into occupied property, and one count of assault with a deadly weapon.  *Adams*, 2011 WL 1938270, at *3.  On appeal, the Court of Appeals concluded there was no error in her convictions.  *Id.* at *7.

Around this time, Locke, who was a staff writer for the N&O, became interested in the *Green* and *Adams* cases and obtained copies of the photographs from Whitehurst.  After speaking with Sutton, Locke began working on a story about plaintiff's work in the *Green* and *Adams* cases.  As part of her research, Locke reviewed the court filings and evidence from the *Green* and *Adams* cases, interviewed Jemaul Green in prison, and researched the discipline of firearms examination.  In an early draft for her story, Locke included a direct quote from Sutton:  "[Plaintiff] just made it up.  She made it up because she could, and prosecutors needed her to.  It's that simple."  Locke began looking for experts in firearms examination or related fields willing to comment on the Whitehurst Photographs.  To that end, Locke communicated by email and phone with Bill Tobin and Adina Schwartz, both mentioned above, as well as Liam Hendrikse, a firearms forensic scientist from Canada, and Dr. Stephen Bunch, a firearms forensic scientist and former FBI

---

[4] Tobin later testified that this statement attributed to him in the motion was accurate except for the use of the word "ample," which he did not recall using.

scientist from Virginia. Locke and the N&O ultimately published statements which were attributed to these four individuals as purported firearms experts and which in effect confirmed Sutton's allegation—that is, defendants published statements asserting that firearms experts had examined the Whitehurst Photographs, determined that plaintiff's analysis was false, and questioned whether plaintiff was extremely incompetent or had falsified her report in order to help the prosecution convict a potentially innocent man. As will be discussed more in-depth below, these four individuals strongly disputed making the statements attributed to them by defendants.

Defendants planned to publish Locke's story as part of its "Agents' Secrets" series in August of 2010. John Drescher, the executive editor and senior vice president of the N&O, described the series in an email to the N&O's vice president in charge of marketing, stating: "In August, we'll publish a four-part series, 'Agents' Secrets,' showing how practices by the [SBI] have led to wrongful convictions. The series, by reporters Joseph Neff and Mandy Locke, reveals that the agency teaches its laboratory analysts and agents to line up with prosecutors' theories, sometimes with devastating results." Locke testified that she and Neff, as well as Steve Riley, the senior editor directly responsible for editing the "Agents' Secrets" series, "were constantly in communication" when preparing the series for publication. According to Locke, "we do double-check each other's work," and "there wasn't a day that passed that we weren't comparing notes and collaborating in some form or fashion."

In one of these email communications in May of 2010, Locke stated that they were "rocking and rolling on the SBI project" and included plaintiff in a list of "a few agents/analyst[s] who we are bearing down on." Locke requested "reports (absolutely everything we know)" on these agents. Upon learning that plaintiff had a degree from Julliard, Locke wrote that she was "curious to know of her discipline" and asked for a "search or anything else . . . that would register someone who was an artistic genius." When she received in response an article discussing plaintiff's previous career as a ballerina; Locke wrote: "Yes. Bingo! How in the world this woman went from ballet to firearms identification work is beyond me. But, what a lovely tidbit." Locke passed this information along to Neff, who responded, "lovely. [T]hat's even better than a bassoonist." In an email Riley sent to Drescher, Locke, and Neff, he discussed the progress of the "Agents' Secrets" series, stating that "this all adds up to some pretty serious allegations against individual agents, and we've got to be properly loaded if this is to be written with an edge, as it should be." An internal story folder circulated to N&O staff summarized the upcoming article, stating that "Beth Desmond, the SBI analyst charged with studying the cartridges and bullet fragments . . . said she's dead certain there was a single gun used that day" and that "Desmond had no idea how to evaluate firearm evidence or, worse, she ignored all rules of the trade and fabricated the results to help police secure their victory."

Near the end of July 2010, defendants decided to move up their planned publication date of the "Agents' Secrets" series. John Drescher explained in an email:

"News breaking here. In advance of our SBI series, Roy Cooper [the Attorney General] is replacing the SBI director. We likely will move series to start Sunday, Aug. 7." In an email later that day, Steve Riley confirmed the decision to move up the publication date, stating: "I know this makes things harder for everyone, but this will make us much more timely," and "[e]verything won't be perfect, but it'll be good." Locke later emailed Shawn Rocco, one of defendants' photojournalists involved in the series, apologizing for the "strain" of the new publication date and stating "[b]elieve me, I'm feeling it too. Especially with Joe [Neff] gone and out till Friday." Rocco responded:

> [H]mmm, how to say this nicely . . . shut up. [Smiley Icon] we're all in this together.
>
> [C]oncentrate on writing the best damn piece you've ever done. [I] want you to compel our readers to gather pitchforks and torches. [B]ecause shit like this has got to change.
>
> [I]'m infuriated that robin [Pendergraff] still keeps a job. t'aint nothing new in state gov, I know, but I'm pissed nonetheless.

When the SBI and plaintiff first became aware of the Whitehurst Photographs in July 2010, they immediately had concerns that the photographs were misleading due to a variety of issues. Jerry Richardson, then the assistant director of the SBI Crime Laboratory, emailed Whitehurst to discuss the misleading nature of the photographs, stating:

> [W]e have noted a number of issues associated with the photos. These issues include: photographs are not properly oriented, improper side lighting, unknown microscope magnification; focus; and, the use of what appears to be tweezers or other metal objects to handle evidence during photography which could alter the evidence.

When plaintiff learned that the N&O and Locke were planning a story about firearms examination involving the Whitehurst photographs, plaintiff contacted Locke to arrange a meeting.

During the resulting interview at the SBI's crime lab on 3 August 2010, plaintiff explained to Locke that for numerous reasons the Whitehurst Photographs did not depict the matching class characteristics that plaintiff had observed in her laboratory analysis. Plaintiff explained that firearms examination is "three-dimensional" and that "it's very difficult to show in just one picture what we do. It's not truly representative of what we do in firearms."[5] Further, plaintiff noted that while she "ha[s] great respect for [Whitehurst]," "he's not a firearms expert, and he knows that." One of the problems with the Whitehurst Photographs, plaintiff explained, was the lighting. Plaintiff stated that "[i]t takes hours under the microscope to get the right lighting, to get them lined up the right way to be able to measure those. It's very careful and patient examination." Plaintiff stated that

---

[5] The transcript of Locke's interview with plaintiff contains formatting issues that are omitted here for clarity.

another issue on a more fundamental level was that the bullets in the Comparison

Photograph were improperly positioned. Plaintiff explained:

> MS. DESMOND: And so that's the end of the base right here and that's it. This bullet here, this is the base but the—
>
> MS. LOCKE: Uh-huh.
>
> MS. DESMOND: –the nose is up here.
>
> MS. LOCKE: So it's base to base.
>
> MS. DESMOND: Correct.
>
> MS. LOCKE: Okay.
>
> MS. DESMOND: In firearms, we don't do that. We never do that. Every bullet we look at would be similar in casings. The nose is to the left the nose is to the left, or if the nose is to the right and the nose to the right. [sic] Okay. So we would never compare anything base to base. That's wrong. That's just not right. Everyone who is a firearms examiner 101 knows not to do that.
>
> But this is basically what this picture is showing. If you do that base to base – this is the base and there's the base here. Put these together and you try to line them up. They're going to be off. Right? They're going to look like they're not in alignment.
>
> MS. LOCKE: Uh-huh.
>
> MS. DESMOND: They're not going to look right. They're – it's a mis-perception. You can't – it doesn't look like the other base, not even close.

Plaintiff repeatedly stressed that the Comparison Photograph "is not depicting what

I saw in the microscope and what I measured." Plaintiff explained, "[t]hat's why you

need to put it on the microscope. You cannot do it from a picture." Plaintiff and Locke discussed the fact that plaintiff's work had been checked by Neal Morin, who examined the bullets under a microscope and reached the same conclusions as plaintiff. Moreover, plaintiff stated: "I guarantee that if you ask another qualified examiner, a qualified firearms examiner, what they – to go ahead and examine it under the microscope, that they will come to the same conclusion I have." In that regard, Locke asked plaintiff about the fact that the bullets were going to be sent for an independent examination. Plaintiff responded, "[t]his is what we've been asking them to do. . . . Of course, we would like for it to be sent to any other qualified firearms examiner. We have been asking for it."

At no point in the interview did Locke mention anything about firearms experts asserting based on the Whitehurst Photographs that plaintiff's analysis had been false and questioning whether plaintiff was incompetent or corrupt. According to plaintiff, Locke simply told her that "it's a firearms piece in a much larger article." Towards the end of the interview, plaintiff attempted to make sure Locke understood what she was saying, asking "[d]id I make things clear for you?" and "[d]o you understand what I'm saying." Locke said that she did. Plaintiff would later testify that:

> I thought she understood. I thought that – I thought I set
> the record straight. You know, I thought I had – I went in
> there and told her how I had testified in the Pitt County
> case, I told her the facts of the case, and then I explained
> to her why this picture – she shouldn't rely on the picture

and how we in turn don't rely on pictures to – you don't form an opinion on a picture.

Plaintiff testified that she "felt relieved that [she] had done the interview with" Locke. Before Locke left, she asked if she could take plaintiff's picture, stating "I would love to take a picture of you because we've asked for your photo to be provided." Plaintiff stated:

> MS. DESMOND: It's – it's fine. You can. I would prefer, though, if – if you don't mind, if you – how can I say this? I absolutely don't mind you taking my picture. If you were going to print the picture, please take great care because I work a lot of cases.
>
> MS. LOCKE: Uh-huh.
>
> MS. DESMOND: And I do work on sometimes cases that are very sensitive and I don't want my name and picture out there for safety reasons. And that's the only thing.
>
> MS. LOCKE: Okay.
>
> MS. DESMOND: So just be aware of that, if you don't mind.

Eleven days later, in accordance with their advanced publication schedule, defendants published on the front page of the N&O the following story (the 14 August Article) featuring plaintiff's picture, as well as an even more prominent picture of the Comparison Photograph coupled with a caption inquiring of the audience, "WHAT CAN YOU SEE?":

— Doc Ex 900 —

# THE NEWS&OBSERVER

NEWS UPDATES AT WWW.NEWSOBSERVER.COM · FINAL EDITION, 75 CENTS    SATURDAY, AUGUST 14, 2010    ©2010 THE NEWS AND OBSERVER PUBLISHING COMPANY · RALEIGH, N.C.

## MORE NEWS

**UPDATES ALL DAY AT NEWSOBSERVER.COM**

**COMING SUNDAY**



ETHAN HYMAN - ehyman@newsobserver.com

High school football season begins Friday. See analyses of the Triangle's toughest teams and players.

**ONE GUILTY PLEA IN DEATH OF APEX TEEN**

One of four teens accused of taking part in the 2008 death of Matthew Silliman pleads guilty to second-degree murder and will testify against another suspect.    **1B**

**911 ADAPTS TO THE SMART PHONE**

Durham is among a few 911 emergency centers in the state that could soon be receiving emergency texts and videos, but AT&T objects.    **4B**

**FDA GIVES OK TO NEW CONTRACEPTIVE**

Family planning advocates praised the FDA's approval of a pill that can prevent pregnancy for up to five days after sex, but anti-abortion groups disagreed.    **3A**

**S.C. CANDIDATE FOR SENATE INDICTED**



Alvin Greene, the unemployed veteran who unexpectedly won the Democratic nomination, is indicted on obscenity charges.    **6A**

**WEATHER**



Today: A slight chance for thunderstorms. High 90, low 72

Sunday: Pretty much the same as today. High 90.

---

**AGENTS' SECRETS:** JUNK SCIENCE, TAINTED TESTIMONY AT THE SBI

# SBI relies on bullet analysis critics deride as unreliable

**'This is as bad as it can be,' a former FBI analyst says of work in Pitt County case.**

*Last of four parts*
BY MANDY LOCKE
AND JOSEPH NEFF
STAFF WRITERS

Beth Desmond looked through a microscope at two mangled bullets.

It was the start of a 2006 murder trial in Pitt County, and prosecutors needed her help to fix a potentially crippling weakness in their case. They asked Desmond, an SBI firearms analyst, to determine whether the two bullet fragments had passed through the same gun, a Hi-Point 9 mm she had already linked to a cluster of casings at the crime scene.



SBI agent Beth Desmond

Desmond's answer was quick, sure and pleasing to the prosecution. But her work in the case has threatened the integrity of yet another unit of the State Bureau of Investigation.

A News & Observer investigation of the SBI has revealed more than a dozen instances in which agents cheated or bent the rules to secure an answer prosecutors sought. At the crime lab, examiners have bypassed accepted techniques, despite pushback in the wider scientific community. Even when their bosses learn of mis-

steps, they often do nothing.

Attorney General Roy Cooper has asked his new director, Greg McLeod, to review the work of the firearms identification unit, citing concerns raised by The N&O this summer. Cooper, a Democrat, removed previous director Robin Pendergraft, who in an N&O interview struggled to explain flawed lab work.

With Desmond's Pitt County assignment, the stakes were high. A 10-year-old boy had caught a bullet during a street fight between two

groups of rival teens. His death rocked the small town of Ayden. Her analysis would make or break the case against Jemaul Green, the man they believed accidentally killed Christopher Foggs.



Jemaul Green is in prison.

Desmond would turn to firearms and toolmark identification, one of the oldest and most contro-

versial disciplines of forensic science, to harness these clues into proof that Green was the only gunman. Green had insisted from the start that another man had fired first and that he shot back in self defense. The gun – or guns – had vanished, leaving only a smattering of casings and bullet fragments.

Desmond examined a bullet found in the eaves of a nearby house; the other was collected from the yard near where Christopher collapsed.

**SEE BULLETS, PAGE 8A**

**WHAT CAN YOU SEE?**

SBI firearms analyst Beth Desmond compared these two bullet fragments (photo, left) in 2006 for a murder case in Pitt County. She testified they came from the same model handgun, helping prosecutors win a conviction.

Firearms analysts compare the markings made on bullets as the projectiles travel through the barrel of a gun.

Lands are depressions on a bullet. Grooves are the raised areas between the lands. The number of lands and grooves are the same on each bullet that passes through the barrel of an individual firearm; they are also consistent for all guns of a particular type.

To find that number for a deformed bullet, analysts measure a single land and a single groove and plug the results into a formula. Desmond plugged in virtually identical measurements for the land and groove on each bullet.

Other firearms analysts say that even with the poor photo lighting and deformed bullets, it's obvious that the width of the lands and grooves are different.

Desmond took no photos. The photo was taken by a former FBI crime lab analyst in the presence of a prosecutor. Desmond said the photos don't match what she saw under the microscope. She said that bullets can be manipulated in photos "to make them look like they don't match."

Two bullet fragments are shown end to end in this photo and magnified seven times.

Grooves · Lands

Photo courtesy of Fred Whitehurst

The News & Observer

---

| Sunday | Tuesday | Thursday | TODAY | ONLINE |
|---|---|---|---|---|
| A confession doesn't add up | Bloodstain analysis: 'A bunch of malarkey' | Lab's policies pump up prosecution | Alarm bells about ballistics work | See videos and catch up on the series at newsobserver.com |

---

# Soldiers wonder if their work is enough

BY DION NISSENBAUM
MCCLATCHY NEWSPAPERS

ARGHANDAB, Afghanistan – Setting out on one of their final patrols in Afghanistan, the U.S. Army and Afghan soldiers waded through waist-deep streams, scampered over crumbling mud walls and were closing in on a suspected bomb-making factory when their mission came to an unexpected halt.

Fifty yards short of their target, an Afghan soldier had



Sophomore Ashley Matthews, left, helps senior Mary Woessner move into The Oaks, apartment-style housing at Meredith College.
ETHAN HYMAN - ehyman@newsobserver.com

# Meredith hopes to leave

---

# Alcoa foe paid worker on TV story

BY LYNN BONNER
STAFF WRITER

A researcher who worked on UNC-TV news stories critical of the aluminum



**PLAINTIFF'S EXHIBIT**
1

Defendant's 14 August Article is highly critical of plaintiff and her work in the *Green* case and includes numerous assertions and opinions concerning plaintiff that Locke later attributed to the four purported firearms experts mentioned above, including, *inter alia*, the following five statements:

> 1.  "Independent firearms experts who have studied the photographs question whether Desmond knows anything about the discipline.  Worse, some suspect she falsified the evidence to offer prosecutors the answers they wanted."
>
> 2.  " 'This is a big red flag for the whole unit,' said William Tobin, former chief metallurgist for the FBI who has testified about potential problems in firearms analysis.  'This is as bad as it can be.  It raises the question of whether she did an analysis at all.' "
>
> 3.  "The independent analysts say the widths of the lands and the grooves on the two bullets are starkly different, which would make it impossible to have the same number."
>
> 4.  " 'You don't even need to measure to see this doesn't add up,' said Hendrikse, the firearms analyst from Toronto.  'It's so basic to our work.  The only benefit I can extend is that she accidentally measured the same bullet twice.' "
>
> 5.  "Other firearms analysts say that even with the poor photo lighting and deformed bullets, it's obvious that the width of the lands and grooves are different."

In a section alleging that "[a]t the SBI lab, training is often minimal," the article claims that plaintiff "was a novice examiner" who "came to the field through a peculiar route" and discusses plaintiff's prior career as a ballerina.  According to the article, the prosecutors in the *Green* case "needed [plaintiff's] help to fix a potentially

crippling weakness in their case" and that her analysis of the two bullet fragments pictured in the Comparison Photograph[6] "would make or break the case against Jemaul Green." The article does not mention that thirteen eyewitnesses to the shooting testified that they saw no one other than Green with a firearm. The article also asserts that when plaintiff examined the two bullets in the Comparison Photograph she "scribbled down the measurements of the lands and grooves" and that "[h]er report eliminated doubt about another shooter." The article does not mention that four additional bullets were recovered from the scene and that plaintiff, as reflected both in her typed report and her trial testimony, concluded that no determinations could be made as to these four bullets.

Additionally, the article mentions plaintiff's use of the "absolute certainty" language and states that plaintiff "said this month that she meant to say she was absolutely certain that the bullets were consistent with a Hi-Point 9mm." According to the article, "[t]o make either determination, [plaintiff] had to conclude that the bullets had the same number of lands and grooves," and that, in any event, "[i]t is [plaintiff's] measurements that befuddle independent analysts asked to evaluate the photographs of the two bullets."

---

[6] The 14 August Article notes that the Comparison Photograph was taken by Whitehurst, whom the article describes as a "former FBI crime lab analyst" and an attorney "who formerly worked at the SBI's crime lab." The article includes a quote from Whitehurst, stating that "[i]t didn't take a lot of analysis to see there was something really off here." The article does not explain, as Locke discussed in her trial testimony, that firearms "was not [Whitehurst's] discipline; he was a chemist" and that Whitehurst "just so happen[ed] to own a microscope that had the capacity to take a photograph."

Shortly after the 14 August article was published, Bill Tobin called Jerry Richardson to apologize for the way his statement had been portrayed, to explain that the statement explicitly attributed to him in the article was a version of a statement he made only in response to hypothetical "what-if" questions from Locke, and to make clear that he was not one of the "independent" experts referenced in the other statements in the article. Liam Hendrikse, who was also unaware that he was supposed to be one of the "independent" experts referenced in the article, contacted the N&O to request a retraction for statements that were explicitly attributed to him.

Plaintiff was in Pennsylvania visiting her father in the hospital when she heard about the 14 August Article. Plaintiff testified that when she was able to get to a computer and pull up the article, she was stunned:

> I was surprised at how the size of this, the picture was just right there, and this picture just popped up on the screen, and all I could see was like what can you see in asking the reader what they can see looking at this photograph after I had just finished telling her all the reasons, everything I thought was wrong with why you shouldn't use this photograph.
>
> And so I immediately felt like the blood just ran out of my body. I didn't know if I was angry or if I was upset. I didn't know how to feel when I looked at this and so I started trying to read it and I couldn't get through the first paragraph. I had to walk away. I had to keep coming back and reading the article in little bits and pieces and there were things that just kind of stuck out with me like they needed her to fix, you know, fix the case, and falsify the evidence and ballerina. It was almost implying that someone like me, a ballerina, had no business doing firearms examinations and that I was incompetent. I

> mean, this is – it was insane. It's reporting that these experts in my field are saying – are saying that I falsified evidence and saying that I didn't even do the analysis and that these can't possibly be what I said they were, that they're starkly different, and so I was stunned.
>
> I was stunned at how large the article was. I thought it was just going to be a little blurb. I thought it was just going to be a little piece in a larger article, and the fact that it was me and my picture and these bullets are there on the front page as soon as you look, I was stunned.

An August newsletter for John Jay College of Criminal Justice reported that "a forensic analyst from the [SBI] in North Carolina and John Jay College of Criminal Justice alumna, Beth Desmond, has been accused of making a mistake in matching two bullets that sent an innocent man to prison for murder, according to the *News and Observer*, Raleigh, NC."

After the 14 August Article was published, Stephen Bunch performed an independent examination of the ballistics evidence from the *Green* case. The results of Bunch's report corroborated plaintiff's examination. Bunch testified that plaintiff "basically got the same answers [he] did." Regarding the class characteristics in the two bullets depicted in the Whitehurst Photographs, Bunch stated that "[t]hey're spot on."

On 31 December 2010, the N&O published a follow-up article (the 31 December Article), also written by Locke and Neff and entitled "[r]eport backs SBI ballistics."[7]

---

[7] The article, published on the front page of the N&O, again features plaintiff's picture.

Compared to the 14 August Article, the 31 December Article devotes considerably more attention to plaintiff's use of the "absolute certainty" language and includes a subheading stating, "[h]owever, agent's courtroom certainty that bullets came from one gun in question."[8]  The article, which repeats much of the factual recitation from the 14 August Article, briefly discusses the results of Bunch's independent examination of the ballistics evidence that had been the focus of the previous article, but alleges that Bunch's "findings undermined the certainty of [plaintiff's] testimony."  In the same vein as the five statements from the 14 August Article quoted above, the 31 December Article includes an additional allegation that is attributed explicitly, in part, to Bunch:

> 6.      "Ballistics experts who viewed the photographs, including a second FBI scientist who wrote the report released Thursday, said the bullets could not have been fired from the same firearm."

In one of her first cases following the publication of the 14 August Article plaintiff was told "to be prepared, they're coming after you," and thereafter she began facing aggressive cross-examination from defense attorneys on the basis of the article's allegations.  Plaintiff testified that in an Alamance County case a respected defense attorney "came after [her] really hard," holding up the 14 August Article in front of the jury and vigorously interrogating plaintiff about the various things of which she'd been accused.  The same attorney was quoted at that time in an article

---

[8] Plaintiff never testified that the bullets came from one gun.

in the Charlotte Observer, also written by Locke and Neff, as stating that plaintiff "is putting false information in the courts" and "lacks the credentials and training to do her job."[9]  Plaintiff testified that when she realized this attorney was representing a defendant in one of her subsequent cases, "she became very pale knowing that it was him" and "was so afraid of what [he] might have done when [she] went to testify in front of him again."[10]  Plaintiff stated that her "credibility and [her] character had been attacked and that [she] was always constantly having to defend [her]self from that point on."

Plaintiff's difficulties continued following the publication of the 31 December Article.  Plaintiff stated that she "felt like [the 31 December Article] didn't really do anything to clear [her] name" and that "[i]t seemed like it was just following me around and there was nothing I could do to get rid of what was in that first article."  At an Association of Firearms and Tool Mark conference that plaintiff attended in Buffalo, New York, after putting on her nametag, plaintiff was asked, "[y]ou know you're a little famous, don't you?"  Plaintiff stated she became embarrassed to wear

---

[9] This Charlotte Observer article, which repeats statement 2 from the 14 August Article, was admitted into evidence only on the issue of damages.

[10] Plaintiff testified that this attorney apologized to her at a subsequent trial, stating:

> I remember when I got off the stand, I went down and as I crossed by his table, I remember him reaching up, grabbing my hand and pulling me down and saying, "Hey, listen.  I'm so sorry for what I did to you."  He said, "I hope you can forgive me," and I shouldn't have listened to them or something to that effect.

her name tag because everyone seemed to be discussing the 14 August article, with one prominent firearms expert asking, "aren't you the girl that's caused all the trouble down in North Carolina?"

Plaintiff testified that she realized that her "life as a firearms examiner or in the forensic science field had changed and . . . [she] had continued to struggle ever since then." Plaintiff found "it was difficult to work cases," and she began "having trouble concentrating on anything." When the SBI's crime lab was evacuated due to a bomb threat, she felt responsible. Following an incident in which plaintiff returned home from work and saw "a car in front of [her] house and there were two men, and one guy was outside of his car with the door open and taking pictures of [her] house and [her] son was playing in the driveway," plaintiff became "obsessed with safety" and "would GPS [her] son everywhere that he went." Eventually, plaintiff requested a transfer and ultimately was transferred out of the crime lab in September 2013.

Procedural History

Plaintiff filed this defamation action against defendants on 29 November 2012.[11] Plaintiff originally alleged that sixteen statements contained in the 14 August and 31 December articles were defamatory. Defendants moved for summary judgment, which was denied on 14 March 2014. Defendants appealed.

---

[11] Plaintiff's original complaint included additional defendants, including McClatchy Newspapers, Inc., the "corporate parent" of N&O, that were subsequently dismissed from the case.

On appeal, the Court of Appeals determined that defendants' interlocutory appeal was appropriate because the case involved application of the "actual malice" standard, the misapplication of which could "have a chilling effect on a defendant's right to free speech." *Desmond v. News & Observer Pub. Co.*, 241 N.C. App. 10, 16, 772 S.E.2d 128, 134 (2015) (*Desmond I*) (quoting *Boyce & Isley, PLLC v. Cooper*, 211 N.C. App. 469, 474, 710 S.E.2d 309, 314 (2011)). The court explained that "[i]n order to recover for defamation, a plaintiff generally must show that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Id.* at 16, 772 S.E.2d at 135 (citing *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29, 568 S.E.2d 893, 897 (2002)). Significantly however, First Amendment principles mandate that "[w]here the plaintiff is a public official and the allegedly defamatory statement concerns his official conduct, he must prove that the statement was made with actual malice— that is, with knowledge that it was false or with reckless disregard of whether it was false or not."[12] *Id.* at 17, 772 S.E.2d at 135 (alteration in original) (quoting *Lewis v. Rapp*, 220 N.C. App. 299, 302–03, 725 S.E.2d 597, 601 (2012)). Having concluded that defendants' interlocutory appeal was properly before the court, the Court of Appeals proceeded to address whether genuine issues of material fact existed as to

---

[12] Plaintiff stipulated that she was a public official.

-24-

sixteen allegedly defamatory statements contained in defendants' 14 August and 31 December articles.

In evaluating each of these statements, the court noted that while in order to be actionable as defamation a statement must be one of fact, not merely opinion, the United States Supreme Court has cautioned against "an artificial dichotomy between 'opinion' and fact" and has stated that "expressions of 'opinion' may often imply an assertion of objective fact." *Id.* at 20, 772 S.E.2d at 137 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990)); *see also Milkovich*, 497 U.S. at 18–19 ("Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' As Judge Friendly aptly stated: 'It would be destructive of the law of libel if a writer could escape liability for accusations of defamatory conduct simply by using, explicitly or implicitly, the words "I think." ' "). The Court of Appeals noted that fact and opinion can be particularly difficult to separate in a case like this one, "which involves mostly Locke's reports of opinions of experts regarding Desmond's work." *Id.* at 21, 772 S.E.2d at 137. As the court stated:

> Some of the allegedly defamatory statements, though stated as expressions of opinion from experts, may be factually false because Locke reported that the experts expressed opinions regarding Desmond's work that they actually did not express. In some instances, the evidence indicates that Locke asked the experts a hypothetical question, and they answered on the assumption that the facts of the hypothetical question were true, while the facts were actually false and Locke either knew the facts were

> false or she asked the question with reckless disregard for the actual facts. The experts' opinions were then stated in the article as opinions which the experts gave about Desmond's actual work, instead of in response to a hypothetical question. Thus, the statements, even as opinions, "imply a false assertion of fact" and may be actionable under *Milkovich*.

*Id.* at 21, 772 S.E.2d at 137; *see Milkovich*, 497 U.S. at 20 (stating that "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth"). Ultimately, the court held that ten of the statements were not actionable as defamation, but that the six statements—five published in the 14 August Article and one published in the 31 December Article— were actionable and that genuine issues of material fact existed as to whether those six statements were false and defamatory and whether defendants published these six statements with actual malice. *Id.* at 30–31, 772 S.E.2d at 143. Accordingly, the court affirmed in part and reversed in part the trial court's denial of defendants' motion for summary judgment and remanded the case for trial.

Defendants filed a petition for discretionary review of the interlocutory appeal, which this Court denied.

At trial, plaintiff called approximately twenty-three witnesses and presented over one hundred exhibits. Plaintiff's evidence in support of her defamation claim included extensive evidence relating to the *Green* and *Adams* cases, Locke's research

and preparation of the articles, Locke's interviews and communications with various individuals, and communications between employees of the N&O. Plaintiff also presented evidence concerning the issue of damages focusing heavily on the mental and emotional impact plaintiff suffered as a result of defendants' articles, including testimony from her psychiatrist and counselor stating that plaintiff suffered from post-traumatic stress disorder. Defendants called two witnesses, including Locke, and presented fewer than twenty exhibits. At the close of plaintiff's evidence, and again at the close of all evidence, defendants moved for directed verdict under Rule 50 of the Rules of Civil Procedure. The trial court denied these motions. The jury found both the defendants liable for defamation for the first five statements and awarded plaintiff $1,500,000 in damages; as to statement six, the jury found the N&O liable for defamation and awarded plaintiff $11,500 in actual damages.

The punitive damages phase of the trial began on 19 October 2016. The jury awarded plaintiff $7.5 million in punitive damages against the N&O and $75,000 against Locke. The trial court reduced the punitive damages award against the N&O to $4,534,500.00 pursuant to N.C.G.S. 1D-25(b).[13] Defendants moved for Judgment Notwithstanding the Verdict (JNOV), or, in the alternative, for a new trial. The trial court denied this motion on 30 January 2017. Defendants appealed.

---

[13] This statute limits punitive damages to the greater of three times the amount of compensatory damages or $25,000.

On appeal, defendants argued that the trial court erred in denying its motion for directed verdict and motion for JNOV because plaintiff failed to present sufficient evidence of actual malice and that there were several errors in the jury instructions. The Court of Appeals disagreed, first determining after a careful review of the record that plaintiff presented clear and convincing evidence that defendants published the six statements with actual malice. *Desmond II*, 263 N.C. App. at 55, 823 S.E.2d at 431. The court then addressed defendants' arguments concerning the jury instructions, concluding that: the trial court did not err in denying defendants' proposed instruction concerning the element of falsity; the trial court did not err in instructing the jury to evaluate falsity using the preponderance of the evidence standard, as opposed to the clear and convincing evidence standard applicable to the issue of actual malice; and the trial court did not err by failing to instruct the jury on the statutory aggravating factors required to support an award of punitive damages. *Id.* at 60–67, 823 S.E.2d at 435–38. Accordingly, the Court of Appeals affirmed the trial court's order and judgment. *Id.* at 67, 823 S.E.2d at 439.

Defendants filed a petition for discretionary review, which this Court allowed on 27 March 2019.[14]

---

[14] After the Court heard arguments in this case, the N&O filed a "NOTICE OF BANKRUPTCY PROCEEDING" advising the Court that The McClatchy Company had filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York and that the N&O was included as an affiliated entity and debtor in the filing. The N&O stated that as a result of the bankruptcy filing, its position was that "further proceedings in this matter are subject to the automatic stay provisions of 11 U.S.C. § 362 pending further order of the Bankruptcy Court." In an order filed 2 April 2020, this Court

Analysis

I.    Actual Malice

Defendants argue that the defamation verdict here cannot be squared with the First Amendment because plaintiff failed to present clear and convincing evidence of actual malice.  According to defendants, plaintiff's evidence reveals only a post-publication dispute between an investigative reporter and her quoted experts centered on subjective intent and unspoken context.  These "misunderstandings," defendants contend, do not establish constitutional actual malice under the First Amendment.  Accordingly, defendants argue that they were entitled to judgment as a matter of law on plaintiff's defamation claim because the evidence was insufficient to create a triable issue of actual malice.  After careful review, we conclude that plaintiff presented clear and convincing evidence of actual malice and that the trial court did not err in denying defendant's motions for directed verdict and JNOV.

The standard of review for the denial of a directed verdict or JNOV is the same and inquires "whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury."  *Green v.*

directed the parties "to inform this Court if and when the bankruptcy court grants relief from the automatic stay provisions or when the automatic stay lapses."  On 30 June 2020, the parties jointly filed a "NOTICE OF BANKRUPTCY COURT'S ORDER MODIFYING THE AUTOMATIC STAY," informing the Court that the United States Bankruptcy Court for the Southern District of New York entered an order modifying the automatic stay "Solely to the Extent Necessary to Permit the North Carolina Supreme Court to Issue an Appeal Opinion" in this case.

*Freeman*, 367 N.C. 136, 140, 749 S.E.2d 262, 267 (2013) (quoting *Davis v. Dennis Lilly Co.*, 330 N.C. 314, 322, 411 SE.2d 133, 138 (1991)).  "If 'there is evidence to support each element of the nonmoving party's cause of action, then the motion for directed verdict and any subsequent motion for [JNOV] should be denied.' " *Id.* at 140–41, 749 S.E.2d at 267 (quoting *Abels v. Renfro Corp.*, 335 N.C. 209, 215, 436 S.E.2d 822, 825 (1993)).  Whether a party is entitled to a directed verdict or JNOV is a question of law that we review de novo.  *Id.* at 141, 749 S.E.2d at 267 (first citing *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 720, 693 S.E.2d 640, 643 (2009); then citing *N.C. Farm Bureau Mut. Ins. Co. v. Cully's Motorcross Park*, Inc., 366 N.C. 505, 512, 742 S.E.2d 781, 786 (2013)).  Further, "[w]e review decisions of the Court of Appeals for errors of law." *Pine v. Wal-Mart Assocs., Inc.*, 371 N.C. 707, 715, 821 S.E.2d 155, 160 (2018) (quoting *Irving v. Charlotte-Mecklenburg Bd. of Educ.*, 368 N.C. 609, 611, 781 S.E.2d 282, 284 (2016)).

As the Court of Appeals noted, "[i]n order to recover for defamation, a plaintiff generally must show that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Desmond I*, 241 N.C. App. at 16, 772 S.E.2d at 135 (citing *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29, 568 S.E.2d 893, 897 (2002)).  Moreover, as the United States Supreme Court first explained in *New York Times Co. v. Sullivan*, the

First Amendment[15] places an additional burden on a plaintiff who is a public official seeking damages for defamation relating to his or her official conduct by requiring the plaintiff to "prove[ ] that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. 254, 279–80 (1964); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 499 (1991) ("The First Amendment protects authors and journalists who write about public figures by requiring a plaintiff to prove that the defamatory statements were made with what we have called 'actual malice,' a term of art denoting deliberate or reckless falsification.").

Notably, "[m]ere negligence does not suffice. Rather, the plaintiff must demonstrate that the author 'in fact entertained serious doubts as to the truth of his publication,' or acted with a 'high degree of awareness of . . . probable falsity.' " *Id.* at 510 (alteration in original) (first quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); then quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) ("Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." (citing *St. Amant*, 390 U.S. at 733)). Further, "[a]ctual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."

---

[15] The First Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *New York Times*, 376 U.S. at 277 (citations omitted).

*Masson*, 501 U.S. at 510–11 (citing *Greenbelt Cooperative Publ'g Assn., Inc. v. Bresler*, 398 U.S. 6 (1970)).

Following *New York Times Co. v. Sullivan*, the Supreme Court has further elaborated on the actual malice standard and the role of the courts in enforcing this constitutional safeguard:

> [t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. This rule is not simply premised on common-law tradition, but on the unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged. The meaning of terms such as "actual malice"—and, more particularly, "reckless disregard"—however, is not readily captured in one infallible definition. Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards. Moreover, such elucidation is particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary. Uncertainty as to the scope of the constitutional protection can only dissuade protected speech—the more elusive the standard, the less protection it affords. Most fundamentally, the rule is premised on the recognition that judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'
>
> . . . .
>
> We have not gone so far, however, as to accord the press absolute immunity in its coverage of public figures or

elections. If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail. A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. The standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity. As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. . . .

> In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the opportunity to observe the demeanor of the witnesses, the reviewing court must examine for itself the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment protect.

*Harte-Hanks*, 491 U.S. at 685–89 (cleaned up); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) ("[I]n cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " (quoting *New York Times*, 376 U.S. at 284–86)).[16]

---

[16] Amici, The Reporters Committee for Freedom of the Press, citing *Bose Corp. v. Consumers Union of the United States, Inc.*, contend that the Court of Appeals below erred

by viewing the evidence of actual malice in the light most favorable to plaintiff and, in doing so, failed to conduct an "independent examination of the whole record" required by United States Supreme Court precedent. 466 U.S. at 499. In *Bose Corp.*, the Supreme Court held that a federal trial judge's ultimate "finding" of actual malice was not insulated from an appellate court's independent examination of the record by virtue of the "clearly erroneous" standard applicable to findings of fact in a federal bench trial. *Id.* at 514 ("[T]he clearly-erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a case governed by *New York Times*."). Notably, however, the Court did not suggest that an appellate court, in reviewing whether the record in a defamation case is sufficient to support a finding of actual malice, should make its own findings of fact and credibility determinations, or overrule those of the trier of fact. For example, the petitioner there alleged that the respondent, in a critical magazine review of the petitioner's loudspeaker system, falsely asserted with actual malice that musical instruments heard through the speakers tended to wander "about the room," as opposed to the truthful description of wandering "along the wall." *Id.* at 488–91. The district court found as fact a lack of credibility in the respondent's employee's assertion in his trial testimony that he interpreted these descriptions as synonymous and, based only on that finding and its finding that "about the room" was not an accurate description, determined that the petitioner had proven actual malice. *Id.* at 511–12. The Supreme Court did not disturb the district court's credibility finding, or any of the district court's "purely factual findings," but simply held that the lack of credibility stemming from the respondent's employee's unconvincing and "vain attempt to defend his statement as a precise description of the nature of the sound movement" did not, by itself constitute clear and convincing evidence that respondent possessed actual malice at the time of the publication. *Id.* at 512–13. This is factually distinguishable from the situation here, in which, as discussed below, plaintiff presented ample evidence tending to show defendants' awareness of falsity and doubts regarding the truth of the six statements at the time of the publication. More to the point, the principle of viewing the evidence in the light most favorable to the nonmoving party on a motion for JNOV, while it must be applied in conjunction with the heightened clear and convincing evidentiary standard and with the appellate court's "independent examination of the whole record," is necessary—where findings of fact and credibility determinations must ultimately be made by the jury—in order to ascertain whether the record can permissibly and constitutionally support a finding of actual malice. Were we to, as amici seemingly urge, make our own factual determinations on the evidence and on the ultimate question of actual malice itself, we would impermissibly invade the province of the jury and conflict with Supreme Court precedent to the contrary. *See, e.g., Time, Inc. v. Hill*, 385 U.S. 374, 394 n.11 (1967) (stating that where a result of either negligence or actual malice "finds reasonable support in the record it is for the jury, not for this Court, to determine whether there was knowing or reckless falsehood" (citing *New York Times*, 376 U.S. at 284–285)). As such, we do not view an appellate court's "duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear

Here, because plaintiff stipulated that she was a public official and because the allegedly defamatory statements concerned her official conduct, she was required to present sufficient evidence for the jury to find by clear and convincing evidence that defendants published the statements at issue with actual malice. The trial court, in denying defendants' motions for directed verdict and JNOV, determined that plaintiff had met this evidentiary burden, and the Court of Appeals affirmed this ruling. Consistent with our "duty to independently decide whether the evidence in the record is sufficient to cross th[is] constitutional threshold," we "must consider the factual record in full" and "examine . . . the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment protect." *Harte-Hanks*, 491 U.S. at 686, 688. In addition to the evidence as summarized in the factual background provided above, we will summarize additional portions of the evidence relevant to plaintiff's claim.[17]

The crux of plaintiff's defamation claim is that in the six statements defendants falsely claimed that independent firearms experts were asserting based

---

and convincing proof of 'actual malice,' " *Harte-Hanks*, 491 U.S. at 685–89, as inherently inconsistent with the principle that a court, on a motion for directed verdict or JNOV, must determine "whether the evidence, taken in the light most favorable to the non-moving party, *is sufficient as a matter of law* to be submitted to the jury," *Green*, 367 N.C. at 140, 749 S.E.2d at 267 (emphasis added) (citation omitted).

[17] We emphasize that our discussion of the evidence in this case is a reflection of the record as viewed in the light most favorable to plaintiff and summarizes what the jury could permissibly have found as fact under a clear and convincing evidentiary standard. It was for the jury, not this Court, to determine whether defendants in fact acted with actual malice, and we note that we give due regard here to the principle that credibility determinations are within the province of the jury.

on the Whitehurst Photographs that plaintiff, either through extreme incompetence or deliberate fraud, had botched her laboratory analysis in the *Green* case with the added consequence of securing the conviction of a potentially innocent man. Plaintiff contended that this false narrative began when Locke first learned of the Whitehurst Photographs and the motion for mistrial filed in the *Adams* case, in which Adams' attorney, David Sutton, stated that "William Tobin says preliminary [sic], based upon a photograph sent by Dr. Whitehurst, there is ample reason to question whether the class characteristics in Q-9 and Q-10 are the same." When Locke discussed the *Green* and *Adams* cases with Sutton in April 2010 and decided to write the story, she included a quote from Sutton in an early draft that was later removed, stating that "[plaintiff] just made it up. She made it up because she could, and prosecutors needed her to. It's that simple." According to plaintiff's theory of the case, defendants decided early on that this was the story and that it would constitute the last of their four-part "Agents' Secrets" series, which reported on alleged errors or wrongdoing by SBI agents and "how practices by the [SBI] have led to wrongful convictions." An internal story folder circulated to N&O staff summarized the planned article, stating that "Desmond had no idea how to evaluate firearm evidence or, worse, she ignored all rules of the trade and fabricated the results to help police secure their victory."

However, all that existed to support such a story, apart from a rather sensational allegation by a zealous defense attorney, was Tobin's statement that the Whitehurst Photographs raised a preliminary "question" over the class

characteristics. As plaintiff's counsel stated in closing arguments, Locke "needed [the story] to be what David Sutton had said. . . . That was what she needed the story to be, but she didn't have it. This is what she had, a question." Accordingly, Locke set out to procure independent experts who would substantiate the story suggested by Sutton. Defendants' articles reported that Locke did indeed obtain such "independent firearms experts" who, having "studied the photographs," not only stated, *inter alia*, that "the widths of the lands and grooves on the two bullets are starkly different, which would make it impossible to have the same number," and that "the bullets could not have been fired from the same firearm," but also "question[ed] whether Desmond knows anything about the discipline" and "suspect[ed] she falsified evidence to offer the prosecutors the answer they wanted." Yet, plaintiff's evidence tends to show no one, not least of which the four individuals to whom the statements were attributed, was willing to make such statements—that is, experts were *not* asserting based on the Whitehurst Photographs that plaintiff's analysis was false and questioning whether plaintiff was incompetent or corrupt. As plaintiff's counsel stated at the end of her closing argument:

> This was the story on April 6th. "William Tobin says preliminary [sic], based upon a photograph sent by Dr. Whitehurst, there is ample reason to question whether the class characteristics in Q-9 and Q-10 are the same."
>
> Well, guess what? This is exactly what [Locke] had on August 14, 2010, the story was the same. After all of the attempts to scramble, to try to talk to everybody, . . .

everybody is saying the same thing. That was still all she
had.

Moreover, plaintiff's evidence tends to show defendants' publication of the false statements was not a result of mere negligence or failure to investigate, but stemmed rather from a "purposeful avoidance of the truth." *Harte-Hanks*, 491 U.S. at 692.

One of Locke's purported sources for the six statements was Bill Tobin, a "former chief metallurgist for the FBI." Plaintiff presented evidence tending to show that Tobin did not make some of the statements attributed to him and that he only made other statements when asked as a hypothetical to assume that a serious mistake had been made in the analysis. For example, in his deposition testimony, Tobin was asked about several of the statements attributed to him:

> Q     If I understand your answer correctly, your comment, This is as bad as it can be, or It doesn't get any worse than this, was assuming that it was determined that a mistake or an error had been made; is that fair to say?

> A     Yes, I would also remind, should remind somebody, that that was out of context. In context I was also implying that what I just said is true with regard to the practice of firearms identification, but one needs to put that also in a systemic context because what I believe we had already discussed, if in fact an error had been made, how it crept through the system through what should have been some systemic peer reviews, supervisory reviews of the crime lab, itself, as well.

> So in other words, even if an error existed, it should have been detected somewhere along the normal system of reviews before it's admitted or before it's released from the agency. So that was in the context in which I said it doesn't get any worse than that, if in fact an error was made.

Again, that's the subjunctive, the caveat or disclaimer, then, comma, then this is it doesn't get any worse than the easiest of the three types of an error creeping all the way through the system. That what I was meaning by it doesn't get any worse than this.

Again, I was not referring to a specific examiner or a specific case. I was just discussing general errors as Type 1, Type 2, and Type 3 errors and the presumed system of checks and balances and error quality control process that should exist in the system. Does that make any sense?

Q  It does. So is it fair to say that your comment of either, This is as bad as it could be or It doesn't get any worse than this, that you may have made to Mandy Locke was not referring to Beth Desmond's work in this case?

A  Correct.

Q  In any of your conversations with Ms. Locke, did you state to Ms. Locke that you questioned whether Beth Desmond knew anything at all about the discipline of firearms examination?

A  *First of all, I continue to advise Fred and Mandy that I have no basis to make any claims of this particular examiner's work. I have none. I have no, I didn't know who she or he was. I had no experience with her work product, so I have no basis to make any statements regarding a specific examiner's proficiency.*

*It's not even a field in which I normally will deal anyway. So on numerous levels I had no basis to make any claim about someone's proficiency. So I don't recall making any statement that she doesn't know anything about firearms or whatever you, firearms identification. I don't recall making that statement.*

If I did, it would have been included in the universe or the entire same pool, it's known as, entire possible

events leading up to an error if one occurred, if one had occurred, but I don't recall making that statement.

Q     So is it fair to summarize your answer by saying you don't recall making any statement like that, but if you had made a statement like that, the only way you could have possibly made a statement like that is if in response to the assumption that a mistake had, in fact, been made and you were laying that out as one possibility along with a lot of other possibilities as the cause of the mistake.

*A     Yes, but that is such a foreign statement. I would not be in a basis to claim that somebody doesn't know anything about an area in which I don't even deal, in which I don't even perform, that I don't even operate.*

So again, I continually admonish—well, not, *I continually reminded Fred and Mandy that I can only present generic assessments of errors, what types of errors and systematic issues from my experiences, both as a scientists and also as a[ ] forensic examiner inside, behind the blue wall.  I can only address these areas generically.*

So I would not have any basis at all to make any statement about someone's proficiency in an area outside of metallurgy material science and possibly legally, in the legal community. *But I would not make such a statement. That's not, I have no basis to make that statement.*

Q     In any of your conversations with Ms. Locke, did you ever tell Ms. Locke that you suspected that Beth Desmond falsified evidence to offer prosecutors the answer they wanted?

A     *No.  Again, I have no basis.  There is not, that is so inconsistent on numerous levels for me to make that statement, so I did not make that statement.*

> Q      In any of your conversations with Ms. Locke did you ever tell Ms. Locke that you questioned whether Beth Desmond had done an analysis at all?
>
> A      I'll say if you take out the two words Beth and Desmond, yes. I do recall including that in the—that's called drylabbing—take the name out and I concluded that, included that in the possible universe of explanations as to what could have occurred if an error had, in fact, been made.
>
> *But I did not specifically indicate that Beth Desmond committed an error. Again, over and over I told anyone with whom I was interacting, I have no basis to judge her work product or her proficiency.*

(Emphases added.) While there were no recordings of Locke's interviews or conversations with the expert sources, Locke wrote in her notes from a conversation with Tobin that Tobin stated that "[p]hotographs are not data upon which I rely to make my decision." Following this passage, Locke's notes include a variation of the Tobin quote later reported in the article as statement 2 ("This is a big red flag for the whole unit," said William Tobin, former chief metallurgist for the FBI, who has testified about potential problems in firearms analysis. "This is as bad as it can be. It raises the question of whether she did an analysis at all."). Yet, immediately preceding this quote, Locke noted Tobin as stating: "Preface this by saying photographs present accurate picture." Locke admitted in her testimony that Tobin was qualifying his statement on the assumption that it was later determined that the Whitehurst Photographs were in fact accurate depictions of the class characteristics

of the bullets. Yet, Locke did not include Tobin's prefatory qualifying statement in the article.

Tobin's testimony is bolstered by email communications between Locke and Tobin prior to the publication of the articles. In a 3 August 2010 email from Tobin to Locke, he stated:

> *I don't do F/TM [firearms/toolmark] examinations, and most particularly don't render opinions from photographs in an area in which I don't function.* I only testify as a scientist objecting to the lack of a scientific foundation for testimonies of individualization (specific source attribution), and report on the opinion of my [rather distinguished] colleagues who also strenuously disagree with the conclusions rendered by F/TM examiners. The science doesn't support such conclusions.
>
> I never testify as to the possible fact of a match, only as to the lack of scientific (and statistical) foundation for inferences of individualization.

(Emphasis added.) Thus, despite Tobin's explicit statement that he did not "render opinions from photographs in an area in which I don't function," defendants attributed statements to Tobin representing that Tobin had specifically analyzed plaintiff work in the *Green* and *Adams* cases. Statement 2 was explicitly reported as a quote from Tobin, and Locke asserted that Tobin was one of the "independent" expert sources for the other statements.

Shortly after the 14 August article was published, Tobin called Jerry Richardson, then the assistant director of the SBI Crime Laboratory, to apologize for

the way Tobin's statements had been portrayed and make clear that he was not one of the "independent" experts referenced in the article. According to Richardson:

> [T]he first morning after I was back in the office after the articles were published I did receive a phone call from a Mr. Tobin. Mr. Tobin immediately apologized to me . . . . He wanted me to share his apologies also with the crime laboratory, with Ms. Desmond, and with our director at the time because of the things that were printed in the article. He made it clear he was not one of the I guess external experts that had made comments. He made it clear to me that his comments were in very general terms. He did say he was answering those questions in a form of "what-ifs," what if this happened and those were how his responses were based, and again he apologized, and he stated at that point he would not have any further contact with the reporter.

This conversation is reflected in an email that Richardson sent later that day to other individuals in the SBI, in which Richardson stated:

> FYI
>
> Bill Tobin, FBI Chief Metallurgist, who is quoted from Saturday's article contact[ed] me earlier today. He wanted to apologize to Beth Desmond, the SBI Firearms Section and me for the manner in which his comments were portrayed in Firearms article. He advises that he only answered questions from the reporter in general terms and actually was not aware of the circumstances of any of the cases and has no knowledge of Desmond's work. Tobin advises that his quotes are from three different questions and appears to have been combined from a series of "What ifs." He further wanted us to know that he is *not* one of the independent experts that is mentioned in the article.

In his deposition testimony, Tobin confirmed that this email accurately described his conversation with Richardson.

Another of Locke's purported expert sources was Liam Hendrikse, a consulting forensic scientist in the field of firearms and ballistics living in Canada. Hendrikse was among those included in the emails circulating the Whitehurst Photographs following the *Adams* trial. When Locke contacted Hendrikse asking if he would be willing to discuss the case, Hendrikse was hesitant to speak with her in part because of the possibility that he could be retained to perform an independent examination of the ballistics evidence from the *Green* case. In an email to Whitehurst and Schwartz, Hendrikse asked if he should speak with Locke and noted that he had not "examined and compared the samples Q9 and Q10 'first hand' " and that "anything that [he] would say would of course be a qualified opinion." Hendrikse wrote that he "suppose[d] he should discuss [Locke's] intentions with her, and then go from there." Schwartz advised Hendrikse to "do whatever's comfortable" and that if he spoke with Locke, "make sure you qualify your opinions as much as you think they should be qualified." Hendrikse also discussed his concerns in an email with another local attorney, stating that he intended to speak with Locke "just to get an idea of her intentions with respect to this article" and that "[i]f the article seems to be more general, than specific, then [he] would see no reason why [he] couldn't comment." After Hendrikse spoke with Locke, he wrote that his concerns were alleviated "given the nature of the article" and that he had "had a very general conversation with the reporter, in my mind perfectly harmless."

At trial, Hendrikse testified that when he spoke with Locke they largely discussed firearms examination generally, and he told her that the class characteristics of the bullets looked different in the Whitehurst Photographs but repeatedly stressed the limitations of photographs and the fact that a physical examination would be necessary to make any determinations about the bullets. With respect to statement 1 ("Independent firearms experts who have studied the photographs question whether Desmond knows anything about the discipline. Worse, some suspect she falsified the evidence to offer prosecutors the answers they wanted."), Hendrikse denied making any such comments and assumed when the article was published that Locke must have been referring to other sources. Similarly, Hendrikse denied making statements 3 and 4 as written, testifying that he never stated that "the widths of the lands and the grooves on the two bullets are starkly different, which would make it impossible to have the same number" or that "You don't even need to measure to see this doesn't add up." With respect to the last portion of statement 4 ("It's so basic to our work. The only benefit I can extend is that she accidentally measured the same bullet twice."), which was specifically attributed to Hendrikse in the article, Hendrikse testified that he did state something similar, but only by way of explanation in response to a question in which he was asked to assume that a serious mistake had in fact been made. According to Hendrikse, this comment

was an explanation that I gave to Ms. Locke in our conversation. Based on assuming somebody went in there looked at these two samples and determined that they actually were different, then how would that mistake have been made, and that was the explanation that I gave her, but that wasn't the only benefit that I came up with because that was prefaced as "I can't tell you whether she's right or wrong because I haven't looked at the exhibits."

After the 14 August article was published, Hendrikse wrote to the N&O with his concerns about the inaccuracies in the article and to request a retraction for the statements that were explicitly attributed to him, stating:

I've been having trouble with the context of the quotes that are attributed to me, and I was wondering if a retraction was possible.

The two quotes that I have real issues with are the following:

1. "The chances of a gun not matching a bullet recovered from the crime scene when it involves an American gun is highly likely. Our days of speaking with such certainty should be over."

The first part of that was misinterpreted. We were speaking on the phone, about Class Characteristics, not Individual Characteristics. When we spoke about how Agent Desmond arrived at determining that the bullet was fired from a Hi-Point, I mentioned that it is usually very difficult to narrow down the possible makes of gun, to just one when analyzing the Class Characteristics of a bullet. The quote makes it seem like I'm saying it's unlikely that you can link a bullet to the individual gun that fired it. This is wrong, and in a nutshell makes me appear to be a lunatic. The existence of such a quote could have longer-term ramifications with respect to my career and credentials.

> The latter part of that quote doesn't really say anything without that first part.
>
> 2. The only benefit I can extend is that she accidentally measured the same bullet twice.
>
> I feel that this is unfair to both agent Desmond, and to myself. Both verbally, and in writing, I stated that I couldn't tell you if she was right or wrong unless I examined the items.

(Emphasis added.)  As previously stated, Hendrikse was unaware at the time that he was purportedly a source for the other statements attributed to the "independent" experts.

Another of Locke's expert sources for the six statements was Dr. Stephen Bunch, a firearms examiner and a supervisor of the firearms and tool mark section at the Virginia Department of Forensic Science laboratory.  In his testimony, Bunch stated that in his one phone conversation and follow-up emails with Locke he answered general questions about firearms examination and denied that he made any of the statements as reported in defendants' articles.  In his first email following their phone conversation, Bunch asked that any of his comments be kept off the record, stating:  "Thank you for being understanding of my refusal to comment about this case.  Frankly, I know nothing factual about it at all."  In subsequent emails, after Bunch had seen the Whitehurst Photographs, Bunch wrote to Locke that "it appears" in the photographs that the class characteristics are different, but that he "would have to look at the actual specimens to really offer a firm opinion."  In a

separate email, Bunch wrote to Locke: "I wish I could see the actual specimens and then I could render a real opinion"; and "[s]trange things can happen though when one observes photos, so I hate to state anything with firmness." Bunch testified that he never told Locke that the class characteristics of the bullets were actually different (or that it was obvious they were different), that he questioned whether plaintiff knew anything about the discipline of firearms examination, or that he questioned whether plaintiff had done an analysis at all:

> Q.     . . . [D]id you ever tell Ms. Locke that it was obvious that the widths of the lands and grooves on the two bullets at issue were different?
>
> A.     I may have suggested that they appeared different in the photographs but I wouldn't have said definitively they were different, no.
>
> Q.     And similar question:  Did you ever tell Ms. Locke that the widths of the lands and grooves on the two bullets were starkly different?
>
> A.     Only I may have used that word in referring to their appearance in the key photograph possibly.  I don't recall.  But I wouldn't have said as a fact that they were starkly different, no, not without examining them.
>
> Q.     Okay.  And in any of your conversations with Ms. Locke did you ever tell Ms. Locke that you questioned whether Beth Desmond knew anything at all about the discipline of firearms examination?
>
> A.     I really don't think so.  I don't think that came up at all in our one telephone conversation so at least not to my recollection.  I can't conceive of – I've had dealings with that and when the FBI questions one examination over another.  That can be a dicey topic.  I've thought about

that a lot over the years, so no, I can't conceive of saying something like that just based on a potential single mistake.

    Q.    And I believe I've already asked you this but I'm going to ask you again: In any of your conversations with Ms. Locke, did you ever tell Ms. Locke that you suspected that Ms. Desmond falsified the evidence to offer the prosecutors the answer they wanted?

    A.    No, I wouldn't have done that. I didn't even think of that myself, as mentioned.

    Q.    Did you ever tell Ms. Locke that you questioned whether or not Beth Desmond had done an analysis at all?

    A.    No, I don't think so. I don't even know for sure whether her name came up in an initial conversation, I don't know. It may have, it may not have. I'm not sure, but it was a general conversation I think about where she could find other examiners to do this or comment on it, and it was the general – maybe a little bit of a general discussion on the science and, you know, the good and the bad or whatever.

Locke originally asserted in a sworn deposition that Tobin, Hendrikse, and Bunch were her expert sources for the six statements. The following day, however, Locke asserted that she had inadvertently omitted Schwartz as an additional expert source for the statements. Locke had one conversation with Schwartz, who is not a firearms expert. In Locke's notes from this conversation, Locke quotes Schwartz as stating "Hi-Point Model C. I don't know enough to dispute that." In her deposition, Schwartz testified that she did not recall Locke asking for her opinion as to whether the bullets in the Whitehurst photograph had been fired from the same gun. Had she

been asked, Schwartz stated that she would have explained she was not "qualified to judge" and "would have referred her to Liam [Hendrikse]." Schwartz further testified in this respect:

> Q.     Did you or would you have ever told Mandy Locke that the widths of the land and groove impressions on the bullets that Beth Desmond examined are starkly different, and therefore it's impossible for the bullets to have the same number of land and groove impressions?
>
> A.     I could only have said I might have said that Liam had that opinion or that Fred had that opinion, or possibly if Bill Tobin had that opinion, or possibly if Bill Tobin got involved that they had that opinion. I'm not competent to have such an opinion. I was not then and I am not now. I have never been competent to have such an opinion.
>
> Q.     And would you have ever told Mandy Locke that the bullets in question could not have been fired from the same firearm?
>
> A.     Again, I am not competent to have such an opinion.

Regarding statement 1 ("Independent firearms experts who have studied the photographs question whether Desmond knows anything about the discipline. Worse, some suspect she falsified the evidence to offer prosecutors the answers they wanted"), Schwartz testified:

> Q.     Would you have ever told Mandy Locke that you questioned whether or not Beth Desmond knew anything about the discipline of firearms examination?
>
> A.     I don't recall saying such a thing, I don't. I'd say that this isn't the kind of thing I would have said.

. . . .

> Q.     Would you have ever told Mandy Locke that you suspected that Beth Desmond had falsified her report?
>
> A.     No, that is not something I would have said, chiefly because I don't have access to Ms. Desmond's mind. To say falsified would have been that she did something deliberately lied. How could I know without having access to her mind.

Schwartz's testimony that she would not have made such statements is consistent with her affidavit and testimony in the *Adams* case, as well as an email she sent to individuals interested in the Whitehurst Photographs on 10 April 2010, in which she stated: "[A] definitive statement that the bullets came from two different guns can't be made on the basis of Fred's photographs or, indeed, any photos. To reach a definite conclusion as to the class characteristics on the two bullets, the bullets themselves will need to be examined."

Locke's communications with her purported expert sources tend to show not only that Locke frequently sought to obtain their statements on the hypothetical assumption that plaintiff's analysis had already been determined to be false, which is not the manner in which any of the resulting statements that were actually made were reported in the articles, but also that Locke tended to misrepresent to her sources the SBI's response to any questions that had been raised by the Whitehurst Photographs. For example, when the SBI first received the Whitehurst Photographs

on 24 July 2010, Richardson emailed Whitehurst to discuss the misleading nature of the photographs. Richardson wrote:

> [W]e have noted a number of issues associated with the photos. These issues include: photographs are not properly oriented, improper side lighting, unknown microscope magnification; focus; and, the use of what appears to be tweezers or other metal objects to handle evidence during photography which could alter the evidence.

This email was forwarded to Locke, who then emailed Bunch and Hendrikse stating:

> Not surprisingly instead of addressing a grave mistake the SBI leadership is trying to discredit the photos you and the others saw of those bullet fragments in the case in North Carolina that we discussed. The photographer had the fragments propped up on metal tweezers, but he said he didn't handle the bullets with them. The SBI leadership is saying that the metal-to-metal contact likely corrupted the evidence. Liam, could tweezers, particularly if they are not used to pick up the bullets affect the number of lands and grooves visible? Could it make a new land or groove?

Locke's email, which again opened with the false premise that it was already established that plaintiff's analysis was unsound (i.e. "a grave mistake"), omitted the SBI's legitimate concerns with the photographs and falsely suggested the SBI was asserting that the use of tweezers had "*likely* corrupted the evidence" or even had created new lands and grooves on the bullets. Bunch responded that the fictitious latter proposition was "laughable," and Hendrikse stated that "you'd have to be some sort of ham-handed strong man to accidentally create what looks like equidistant

rifling impressions on either of the fragments, or obliterate rifling that was originally there."

Notably, in Hendrikse's response, he again stressed the necessity of an independent examination in order to resolve any questions concerning the bullets, stating "[t]he fact remains that unless I physically examine them I won't know if ultimately SBI NC are correct or not. Did they ever employ an independent examiner to give a second opinion?" In her responding email,[18] Locke acknowledged that an independent examination was planned, but again misrepresented the position of the SBI:

> Liam, thanks for that; it's what I suspected. They've hired the guy and run through a million hoops to physically get the bullets sent. The DA has dragged his feet per pressure from the SBI. They're avoiding scrutiny.

As Locke admitted in her trial testimony, the latter statements were false, as both the Pitt County DA and the SBI wanted to have an independent examination performed on the bullets.[19]

Locke similarly mispresented what plaintiff had said about the photographs when Locke spoke to her purported sources. In their interview, plaintiff repeatedly

---

[18] This email evidently was not provided to plaintiff by defendants along with the other emails produced during discovery and was instead provided to plaintiff by Hendrikse.

[19] Locke asserted that the false accusations in her email originated with Sutton, stating that "Sutton has a very strong personality, and he had some very strong thoughts, and I think that he had made the issues sound bigger than it was to me, and I erroneously repeated it," and that "Sutton was very frustrated. He felt that Mr. Everett's office was standing in the way of these bullets being tested. I now know and think he was wrong[.]"

stressed to Locke that firearms examination requires physical examination under a microscope by a qualified examiner and cautioned against attempting to draw any conclusions from a photograph, particularly one taken by someone who, like Whitehurst, is not a firearms expert. On the subject of the use of tweezers, plaintiff pointed to this as one example of Whitehurst's noticeable inexperience in firearms examination, stating that this could have "potentially, potentially" impaired the bullets for future examination. Plaintiff explained, "I'm just saying that a firearms person would never use tweezers on any type[,] I don't even care if you['re] only holding them up for a picture. You don't do that. If I had done that, I would have been chased out of here." Plaintiff further stressed that she and the SBI were eager for the bullets to be reexamined, stating, "[t]his is what we've been asking them to do" and that "[o]f course, we would like for it to be sent to any other qualified firearms examiner. We have been asking for it. . . . I am – I have – I'm wanting someone to look at them. That's fine with me." Yet, in an email to Hendrikse later that day, Locke stated that plaintiff was "sure that the tweezers as we discussed last week had ruined the evidence and that no one would be able to make any good conclusions now."

While misrepresenting these portions of the interview to her sources, plaintiff's evidence also shows that Locke ignored other critical aspects of her interview with plaintiff. In the interview, plaintiff not only reiterated what Locke's experts had stated—that no conclusions can, or should, be drawn from mere photographs—but also repeatedly stressed that due to conspicuous issues with the photographs,

including the poor lighting and improper positioning of the bullets, the class characteristics she and Morin had observed *are not visible in the Whitehurst Photographs*, particularly in the Comparison Photograph. As previously noted, plaintiff explained at length how firearms examiners "never compare anything base to base," that "[e]veryone who is a Firearms examiner 101 knows not to do that," and that if "you try to line them up[,] [t]hey're going to be off. Right? They're going to look like they're not in alignment." In this respect, plaintiff also presented evidence that, prior to publication, a photographer for defendants' "Agents' Secrets" series tried to raise this same concern in a team meeting by drawing lines diagonally across a piece of paper, tearing the paper in two down the middle of the lines, and then turning one of the pieces around to show that the lines no longer lined up with each other. Additionally, Locke testified that as part of her research she "read every operating procedure manual for every section of the state crime laboratory as far back as they had retained those materials" and was aware that the bullets were improperly positioned in the comparison photograph. Thus, plaintiff's evidence tends to show that in spite of Locke's awareness of the myriad problems with the Whitehurst Photographs, particularly the "base-to-base" Comparison Photograph, and the fact that no one, most especially plaintiff, was asserting that the relevant class characteristics were visible in the Comparison Photograph, defendants featured the Comparison Photograph prominently on the front page of their newspaper along with the caption "WHAT CAN YOU SEE?" inviting the average reader to look for

something that could not be seen and to do what independent firearms experts would not—form an opinion based merely on a photograph.

Plaintiff's evidence also demonstrated that, despite Locke's sources' repeated statements that any substantive analysis of the bullets in question would require physical examination under a microscope, Locke never sought to interview or otherwise contact Neal Morin. Morin, plaintiff's supervisor at that time, was the only other qualified firearms examiner who had examined the bullets under a microscope, and he had agreed with plaintiff's conclusions regarding the matching class characteristics and had signed off on her work. Plaintiff presented evidence that Locke was aware of Morin and his role in reviewing plaintiff's analysis. In Locke's interview with plaintiff, plaintiff explained:

> MS. DESMOND:    . . . All of my work is checked by a senior examiner, someone that is more senior to me. And so that person takes it back through all the evidence, looks at it and has to come to the same conclusion I did before they sign up – off on it."
>
> MS. LOCKE:      And that would be Neal Morin.
>
> MS. DESMOND:   Yes, it was.

Locke even wrote in her research notes "Check on Neal Morin, approved peer review of Desmond," yet never attempted to contact Morin.

When asked why she had interviewed plaintiff but not Morin, Locke first testified that she did not interview Morin because "the chain of custody log indicated that Mr. Morin had access to specimen for ten minutes," and because "one of the

primary concerns was how [plaintiff's] testimony differed from her laboratory report," and Morin did not testify. Locke acknowledged that plaintiff's "determinations on the class characteristics w[ere] the central question" but asserted that she did not understand how interviewing Morin would "have changed or made this story any different for Ms. Desmond." In her testimony on the following day, when asked why she had not sought to interview Morin when she was already at the SBI crime lab interviewing plaintiff, Locke suggested an additional reason why she had not interviewed Morin:

> "[t]he protocol for talking to anybody employed with the SBI is to reach out to the public information officer. . . . A public information officer was not present in that interview, and so I would not have stormed over to the firearms unit at that moment to try to interview anybody else without looping in the public information officer."

Yet, plaintiff had testified that when she contacted Locke to discuss her concerns with the Whitehurst Photographs, a public information officer's presence was a prerequisite to the interview:

> A. . . . I went to the director and I told him that I wanted to talk to her and at least give the facts of the case that I testified on, only to give the facts of a case that I testified on and to explain, you know, these pictures, if this is what she was looking at, and he had agreed and he had said that the only way he would let me do that is if he would have – he would have the public information officer come in with me to make sure, you know, sit in the room – the interview room, and I said that would be fine.
>
> And so then I called Mandy Locke, and I set up an interview to talk about the Pitt County case.

> Q. And did you in fact have an interview with Mandy Locke?
>
> A. I did.
>
> . . . .
>
> Q. And it was you and Mandy Locke and who else was there?
>
> A. Her name was Jennifer Canada, and she was the public information officer with the Department of Justice.

Morin testified that he was at the lab during Locke's interview with plaintiff, he anticipated being asked questions by Locke, and he was surprised that he was not.

Also relevant to the question of defendants' regard for the truth or falsity of their publications is plaintiff's evidence concerning various mischaracterizations and omissions in the articles. Consistent with the theme of the "Agents' Secrets" series—to show "how practices by the [SBI] have led to wrongful convictions"—the 14 August article asserted that Pitt County prosecutors needed plaintiff's bullet analysis to "fix a potentially crippling weakness in their case" and that plaintiff's "analysis would make or break the case against Jemaul Green." Yet, despite Locke's insistence in her trial testimony that "we try to tell our readers as much as we know and provide to them as much information as we can," the article omits key information about the case against Green, perhaps most pertinently the fact that thirteen eyewitnesses testified at the trial and none of them observed anyone other than Green with a

firearm. Further, Locke acknowledged she was aware of credibility issues with Green and his claim of self-defense which were omitted from the 14 August and 31 December articles. According to Locke, "I think any intelligent reader understanding that a man opened fire in a populated street who had been convicted of murder and sent to prison might have some credibility issues. I didn't need to say that."

The 14 August Article mischaracterizes not only the strength of the State's case, but also the impact of plaintiff's testimony upon the case. For example, the article asserts that when plaintiff examined the two bullets in the Comparison Photograph she "scribbled down the measurements of the lands and grooves"[20] and that "her report eliminated doubt about another shooter." The article mentions neither the four additional bullets recovered from the scene nor the fact that plaintiff, as reflected both in her typed report and her trial testimony, concluded that no determinations could be made as to these four bullets. The 14 August Article also discusses the fact that Green wanted to introduce evidence tending to show that, not long after the shooting, the victim's brother was seen at Vonzeil Adams' house threatening Adams with a gun. According to the article, this "evidence that [the

---

[20] In her trial testimony, Locke denied that the word "scribbled" conveyed any negative connotation, stating, "[n]o, I do not agree with that. My doctor scribbles." Locke also asserted that the 14 August Article's discussion of plaintiff's prior career in ballet was intended to be complimentary and denied that it was in any way derogatory, explaining that "it was really interesting that she had this background." The discussion is included in the article as part of a section alleging that "[a]t the SBI lab, training is often minimal" and claiming that plaintiff "was a novice examiner" who "came to the field through a peculiar route." By contrast, in discussing with Hendrikse his prior work as a model, Locke told him she would not have reported it because it would not have been relevant.

victim's brother] could have been a second shooter" was excluded because "Desmond had convinced the judge:  Nothing but bullets and casings from a Hi-Point 9mm Model C had been recovered there."  This is false, as the judge's primary ruling was that the proffered evidence was inadmissible hearsay and, as previously stated, plaintiff made no determinations as to four additional bullets recovered from the scene.

The 14 August Article also discusses plaintiff's use of the "absolute certainty" language in her trial testimony, noting that plaintiff at one point "concluded with 'absolute certainty' that they were fired from the same kind of gun."  The article states that plaintiff "said this month that she meant to say she was absolutely certain that the bullets were consistent with a Hi-Point 9 mm."  What the article does not state and what Locke, having read the trial transcripts and specifically discussed this issue with plaintiff, was aware of is that plaintiff's "absolute certainty" comment was made during *voir dire* outside of the presence of the jury, that it occurred after plaintiff had already testified regarding her analysis of the cartridge casings and bullet fragments, and that the *voir dire* examination concerned the prosecution's proposed demonstration of how a semiautomatic handgun's ejection port works.[21]  Thus, it is unlikely that any purported issue with plaintiff's "absolute certainty" language (as opposed to "scientific certainty" or "consistent with") had any effect on the trial or the

---

[21] Thus, the *voir dire* examination was not conducted in order for the trial court to rule on the admissibility of plaintiff's expert testimony.

jury's verdict, contrary to the suggestion of the 14 August Article. This information is similarly omitted in the 31 December Article, despite the fact that this article focuses far more heavily on the purported "absolute certainty" issue rather than on plaintiff's substantive analysis of the bullets.[22] Additionally, the subheading of the 31 December Article erroneously refers to plaintiff's "certainty that bullets came from *one gun*," rather than one type of gun.

Finally, plaintiff's evidence demonstrates that defendants were aware not only of the necessity of an independent examination of the bullets in order for any determinations to be made concerning plaintiff's analysis, but also of the fact that the bullets were indeed going to be independently examined—but not before the planned publication date of defendants' "Agents' Secrets" series, in which the 14 August Article was set to be the final article in the four-part series. Defendants did not wait for the results of the independent examination, which ultimately confirmed plaintiff's analysis. Instead, shortly before publication, defendants decided to move the "Agents' Secrets" series up a week in order to be "more timely"—that is, to piggyback on the breaking news that the Attorney General had replaced the SBI director.

Overall, following "an independent examination of the whole record," *Bose Corp.*, 466 U.S. at 499, we conclude that the evidence is sufficient to support a finding

---

[22] The evidence, including the 31 December Article and the trial testimony, tends to show an effort by defendants to deflect from what was reported in the 14 August Article about plaintiff's substantive analysis and to portray their story all along as one largely concerned with plaintiff's "testimonial overstatement" in using the "absolute certainty" language.

by clear and convincing evidence that Locke and the N&O published the six statements with serious doubts as to the truth of the statements or a high degree of awareness of probable falsity, *Masson*, 501 U.S. at 510. If the evidence reflected, as defendants urge, a simple "misunderstanding" or a "he-said/she-said dispute" between a reporter and her sources, then it may very well have been insufficient to meet the *New York Times* standard. Here, however, the evidence concerning Locke's purported expert sources, including, *inter alia*, the numerous confirmations that no conclusions should be drawn from photographs, not only tends to support those four individuals' testimony that they did not make the six statements attributed to them, but also tends to show, particularly in light of the expert subject matter at issue, that those individuals would never have made such statements—that, indeed, it would have made little to no sense for them to have made such statements. Meanwhile, the evidence of numerous statements made by Locke in her communications with her purported expert sources and in her deposition and trial testimony would support a finding by the jury of a lack of credibility on her part with respect to the statements attributed to those purported sources and, more generally, to decisions made at each step of the publication process leading up to the 14 August Article. This evidence concerning Locke, including the myriad ways in which she was aware, and repeatedly made aware, of the false aspects of the six statements and various other portions of the 14 August and 31 December Articles, yet evidently disregarded this information, is highly pertinent to the question of Locke's state of mind with respect to the truth

or falsity of the six statements at the time of publication. Moreover, the contrasting evidence between Locke and the purported expert sources must be also considered in the context of the additional evidence concerning the internal communications of defendants' employees, the significant mischaracterizations and omissions in the 14 August and 31 December Articles tending to portray a narrative of events divorced from reality, the attempts by defendants in their 31 December Article and in their testimony and representations in the trial court to shift the focus away from the Whitehurst Photographs and plaintiff's substantive analysis in the *Green* case to the purported issue of plaintiff's "testimonial overstatement," and the fact that defendants did not wait for the independent examination of the ballistics evidence but rather advanced their publication date in order to capitalize on the latest headlines—all of which tends to show, as the Court of Appeals below described it, "that the primary objective of defendants was sensationalism rather than truth." *Desmond II*, 263 N.C. App. at 54, 823 S.E.2d at 431. When viewed as a whole, the evidence is sufficient for the jury to find by clear and convincing evidence that defendants published the statements with actual malice—that is, "knowledge of falsity or a reckless disregard for the truth." *Harte-Hanks*, 491 U.S. at 688.

Certainly, the jury could have found that false and defamatory statements published in the 14 August and 31 December Articles were the result of a significant

pattern of negligence on the part of defendants that fell short of actual malice.[23]

Where, however, the record would support either finding, the question must be

submitted to the jury. *See Time, Inc. v. Hill*, 385 U.S. 374, 394 n.11 (1967) (stating

that where a result of either negligence or actual malice "finds reasonable support in

the record it is for the jury, not for this Court, to determine whether there was

knowing or reckless falsehood" (citing *New York Times*, 376 U.S. at 284–285)).

We recognize the significant societal interests implicated by the issue here and

discussed at length in amici curiae briefs filed by several organizations on behalf of

defendants. The First Amendment "demands that the law of libel carve out an area

of breathing space so that protected speech is not discouraged," *Harte-Hanks*, 491

U.S. at 686 (cleaned up), and this breathing space is particularly vital in the context

of the discussion of issues affecting our criminal justice system and our system of

government. The Supreme Court, however, "ha[s] not gone so far . . . as to accord the

press absolute immunity in its coverage of public figures" and public officials. *Id.* at

688; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974) ("The need to avoid

---

[23] Defendant argues that the law protects a reporter's "rational interpretation" of an ambiguous source, even if the interpretation is wrong. *Time, Inc. v. Pape*, 401 U.S. 279, 289–90 (1971). While the jury, which was instructed on rational interpretation, could have found that defendants' statements were within the realm of rational interpretation, plaintiff presented sufficient evidence to support the jury's finding that the reported statements transcended any rational interpretation and resulted instead from a deliberate falsification or a reckless disregard for the truth. Additionally, defendants note that a plaintiff must establish that a challenged statement is not "substantially true." The issue of the sufficiency of the evidence regarding the issue of falsity is not properly before the Court; in any event, plaintiff presented ample evidence that the six statements were not substantially true.

self-censorship by the news media is, however, not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation."). An individual still maintains a "right to the protection of his own good name." *Gertz*, 418 U.S. at 341. Moreover, while the clear and convincing evidentiary standard is more stringent than the preponderance of the evidence standard, it is not an insurmountable burden. *See, e.g.*, *California ex rel. Cooper v. Mitchell Bros.' Santa Ana Theater*, 454 U.S. 90, 93 (1981) (per curiam) (footnote omitted) ("Three standards of proof are generally recognized, ranging from the 'preponderance of the evidence' standard employed in most civil cases, to the 'clear and convincing' standard reserved to protect particularly important interests in a limited number of civil cases, to the requirement that guilt be proved 'beyond a reasonable doubt' in a criminal prosecution." (citing *Addington v. Texas*, 441 U.S. 418, 423–44 (1979))); *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 721, 693 S.E.2d 640, 643 (2009) (stating that the clear and convincing standard "is more exacting than the 'preponderance of the evidence' standard generally applied in civil cases, but less than the 'beyond a reasonable doubt' standard applied in criminal matters" (citing *Williams v. Blue Ridge Bldg. & Loan Ass'n*, 207 N.C. 362, 363–64, 177 S.E. 176, 177 (1934))). Where plaintiff presented sufficient evidence to meet this evidentiary burden, the issue was properly submitted for a jury determination.

As such, the trial court did not err in denying defendants' motions for directed verdict and JNOV. Accordingly, we affirm the decision of the Court of Appeals with respect to this issue.

II.     Jury Instructions

Defendants next argue that the trial court erred in its jury instructions regarding the issue of material falsity by instructing the jury as follows:

> The attribution of statements, opinions or beliefs to a person or persons may constitute libel if the attribution is materially false, or put another way, if it is not substantially true. The question is whether the statements, opinions or beliefs of the individuals that were reported as being held or expressed by the individuals were actually expressed by those individuals.

According to defendants, when a publication attributes a statement to a speaker, the defamatory "sting" is not in the attribution to the source but instead is in "the underlying statement of fact attributed to the speaker." Defendants contend that the trial court instructed the jury to consider only the material falsity of the attribution, standing alone, and never instructed the jury to consider the material falsity of the underlying statement of fact attributed to the speaker. Defendants argue that the trial court should have adopted their proposed instruction, stating:

> If you find that the underlying facts reported by a challenged Statement are substantially true, separate and apart from the attribution to a cited or quoted source or sources, you should find that Plaintiff has not carried her burden of proving material falsity.

We disagree.

"It is a well-established principle in this jurisdiction that in reviewing jury instructions for error, they must be considered and reviewed in their entirety." *Murrow v. Daniels*, 321 N.C. 494, 497, 364 S.E.2d 392, 395 (1988) (citing *Gregory v. Lynch*, 271 N.C. 198, 203, 155 S.E.2d 488, 492 (1967)). Further, "[w]here the trial court adequately instructs the jury as to the law on every material aspect of the case arising from the evidence and applies the law fairly to variant factual situations presented by the evidence, the charge is sufficient. *Id.* at 497, 364 S.E.2d at 395 (citing *King v. Powell*, 252 N.C. 506, 114 S.E.2d 265 (1960)).

With respect to the issue of falsity, "[t]he common law of libel" "overlooks minor inaccuracies and focuses on *substantial truth*." *Masson*, 501 U.S. at 516 (emphasis added). As such, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, *the sting*, of the libelous charge be justified.'" *Id.* at 517 (emphasis added) (citation omitted). Thus, a plaintiff must establish that "the sting," the aspect causing injury to the plaintiff's reputation, is materially false. Stated differently, "the issue of falsity relates to the *defamatory* facts implied by a statement." *Milkovich*, 497 U.S. at 20 n.7. Here, however, what constitutes the actionable defamatory facts has been difficult at times to parse due to the unique factual posture, which involves statements that attribute other statements to third parties as experts opining about plaintiff's work as an expert in the same specialized field. As the Court of Appeals stated in *Desmond I*, "[i]n this case, which involves mostly Locke's reports of opinions

-67-

of experts regarding Desmond's work, fact and opinion are difficult to separate." *Desmond I*, 241 N.C. App. at 21, 772 S.E.2d at 137.

In that appeal, the court rejected defendants' argument that " '[m]any of the statements identified in [plaintiff's] Complaint are simply expressions of opinion' by various experts whom Locke interviewed, not assertions of fact, and thus not actionable." *Desmond I*, 241 N.C. App. at 20, 772 S.E.2d at 136–37. The court explained, as noted above, that "[s]ome of the allegedly defamatory statements, though stated as expressions of opinion from experts, may be factually false because Locke reported that the experts expressed opinions regarding Desmond's work that they actually did not express." *Id.* at 21, 772 S.E.2d at 137. Thus, in these instances, an expert's opinion that by itself would not have been actionable is actionable here because defendants published *an assertion of fact* that the expert made a *statement of opinion* that they did not state. For example, if Bill Tobin had published an article on his personal blog in which he opined that the Comparison Photograph is "a big red flag" and "*raises the question* of whether [plaintiff] did an analysis at all," plaintiff would have been hard pressed to establish that his indeterminate statement, though critical, was sufficiently an assertion of fact to be actionable as defamation against Tobin himself. Where, however, defendants publish a statement claiming that Tobin expressed that same statement of opinion, this statement attributing an opinion critical of plaintiff to an expert in her field is an actionable assertion of fact. In such an instance, "the sting" is in the attribution alone—the false *assertion of fact* that an

expert in plaintiff's field holds an *opinion* critical of plaintiff. Thus, the trial court correctly instructed the jury that an "attribution . . . *may constitute libel* if the attribution is *materially false*." (Emphases added.)

On the other hand, other statements published by defendants attribute to experts statements that contain an assertion of fact in their own right. For example, statement six provides that "[b]allistics experts who viewed the photographs . . . said the bullets could not have been fired from the same firearm." This statement asserts as fact not only that experts made statements concerning plaintiff, but also, in turn, that those experts' statements are assertions of fact that plaintiff's analysis was conclusively wrong. The sting in such a statement is not only in the attribution,[24] but also in the underlying assertion of fact.[25] As such, in order to establish the falsity of

---

[24] We do not agree with defendants' assertion that "when a publication attributes a statement to a speaker, it is not the truthfulness of the attribution that matters." Part of the sting in the allegedly defamatory statements here necessarily lies in the fact that they are attributed to an expert in plaintiff's specialized field. As the Court of Appeals stated, "[w]ithout attribution to experts in the relevant field, the statements have 'a different effect on the mind of the reader.'" *Desmond II*, 263 N.C. App. at 63, 823 S.E.2d at 436 (citation omitted); *see also id.* at 63, 823 S.E.2d at 436 ("The statements are close to nonsense if they are attributed to people with no expertise: '[Several people at Starbucks] who have studied the photographs question whether Desmond knows anything about the discipline. Worse, some suspect she falsified the evidence to offer prosecutors the answers they wanted.'").

[25] As a hypothetical, had Bunch's report, rather than confirming plaintiff's analysis, revealed that the bullets could not have been fired from the same gun, we do not believe that plaintiff would have been able to establish material falsity of this statement in such a scenario. We recognize that in such a scenario a statement attributing only an opinion, rather than an assertion of fact, would necessarily be affected as well; however, we believe that the effect on such a statement would properly be considered not with the issue of falsity, but rather with the issue of damages, *i.e.* the extent to which plaintiff suffered, for example, any harm to her reputation or loss of standing in the community.

such a statement plaintiff was required to show that both the attribution and the underlying assertion were materially false.

In this respect, we think the trial court's instruction on material falsity provided a correct statement of the law:

> Plaintiff must prove by the greater weight of the evidence that the statement was materially false. If a statement is substantially true it is not materially false. It is not required that the statement was literally true in every respect. Slight inaccuracies of expression are immaterial provided that the statement was substantially true. This means that the gist or sting of the statement must be true even if minor details are not. The gist of a statement is the main point or heart of the matter in question. *The sting of a statement is the hurtful effect or the element of the statement that wounds, pains or irritates. The gist or sting of a statement is true if it produces the same effect on the mind of the recipient which the precise truth would have produced.*

(Emphasis added.) On the issue of material falsity the trial court instructed the jury to evaluate whether "the sting" of each statement was substantially true. We do not view the fact that the trial court elsewhere instructed the jury that an attribution may constitute libel, which as discussed above is a correct statement of the law, as an invitation to the jury to disregard its earlier directive to evaluate "the heart of the matter in question" and determine whether "the sting" of each statement was substantially true. Absent such an attribution instruction, the jury may have questioned whether it could properly find an attribution of a mere opinion to be a defamatory statement. By contrast, defendants' proposed instruction could

potentially have misled the jury by inviting the jury to attempt to evaluate "underlying facts"—which the instruction does not define or explain in relation to an assertion of fact actionable as defamation—when there was only an underlying opinion.

Viewing the jury instructions in their entirety, we conclude that the trial court properly instructed the jury regarding the issue of falsity and that there was no error in the instructions.

III.    Punitive Damages Jury Instructions

Finally, defendants argue the trial court erred in instructing the jury on punitive damages because the instructions did not require the jury to find the existence of one of the statutorily required aggravating factors.  We agree.

N.C.G.S. § 1D-15 provides:

> (a) Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
>
>> (1) Fraud.
>> (2) Malice.
>> (3) Willful or wanton conduct.
>
> (b)  The  claimant  must  prove  the  existence  of  an aggravating factor by clear and convincing evidence.

N.C.G.S. § 1D-15(a)-(b) (2019).  "Malice" and "willful or wanton conduct" are defined under this chapter as follows:

(5) "Malice" means a sense of personal ill will toward the claimant that activated or incited the defendant to perform the act or undertake the conduct that resulted in harm to the claimant.

. . . .

(7) "Willful or wanton conduct" means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. "Willful or wanton conduct" means more than gross negligence.

N.C.G.S. § 1D-5.

Here, over defendants' objection, the trial court did not instruct the jury that it was required to find one of the statutory aggravating factors under N.C.G.S. § 1D-15 before awarding punitive damages. The trial court, in reliance on the pattern jury instructions, reasoned that a finding of actual malice in the liability stage automatically allowed for an award of punitive damages and obviated any need for the jury to find one of the statutory aggravating factors. The Court of Appeals affirmed, stating that "the trial court instructed in accord with the pattern jury instructions," which are "the preferred method of jury instruction[.]" *Desmond II*, 263 N.C. App. at 66, 823 S.E.2d at 438 (citing *In re Will of Leonard*, 71 N.C. App. 714, 717, 323 S.E.2d 377, 379 (1984)).

We conclude that the pattern jury instructions utilized in this case do not accurately reflect the law regarding punitive damages and that the trial court erred in failing to instruct the jury that it was required to find one of the statutory

aggravating factors before awarding punitive damages. The preface to the relevant pattern jury instructions provide:

> Under current U.S. Supreme Court jurisprudence, however, in the case of a public figure or public official, the element of publication with actual malice must be proven, not only to establish liability, but also to recover presumed and punitive damages. *Thus, in a defamation case actionable per se, once a public figure plaintiff proves liability under the actual malice standard, that plaintiff will be able to seek presumed and punitive damages without proving an additional damages fault standard*[.]

N.C.P.I.—Civil 806.40 (2017) (emphasis added) (footnote omitted). While the first quoted sentence is correct, the following sentence reflects a misapprehension of the law in this context.

As noted above, the Supreme Court has held that a public official plaintiff seeking damages for defamation relating to his or her official conduct must prove actual malice. *New York Times*, 376 U.S. at 279–80. Additionally, the Supreme Court has held that states may not permit an award of punitive damages in a defamation case absent a showing of actual malice, even where the plaintiff is a private figure. *Gertz*, 418 U.S. at 349. The Supreme Court, however, has not held that a showing of actual malice automatically obviates any state law prerequisites to an award of punitive damages. Thus, plaintiff's successful showing of actual malice in the liability stage *permits* an award of punitive damages under Supreme Court precedent, but it does not eliminate the necessity of a jury finding one of the statutory aggravating factors under N.C.G.S. § 1D-15(a), which does not include actual malice.

In that regard, based on the plain language of the statutory definitions of "malice" and "willful or wanton conduct," we do not view either of these aggravating factors as synonymous with actual malice. As previously noted, unlike "malice" as defined by N.C.G.S. § 1D-5(5), "[a]ctual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson*, 501 U.S. at 510–11 (citing *Greenbelt Coop. Publ'g Assn., Inc. v. Bresler*, 398 U.S. 6 (1970)). Moreover, while actual malice refers solely to a defendant's subjective concern for the truth or falsity of a publication (*i.e.*, knowledge of falsity or reckless disregard for the truth), "willful or wanton conduct" focuses on a defendant's "conscious and intentional disregard of and indifference to *the rights and safety of others*." N.C.G.S. § 1D-5(7) (emphasis added). On top of that, "willful or wanton conduct" requires an additional finding unnecessary for a showing of actual malice—specifically, that "the defendant knows or should know" that the conduct "is reasonably likely to result in injury, damage, or other harm." *Id.*

Certainly, much of the evidence presented in support of plaintiff's showing of actual malice would also be relevant to the jury's determination regarding the existence of the statutory aggravating factors. However, the jury must in fact make such a determination upon proper instructions from the trial court before an award of punitive damages can be awarded. Accordingly, the trial court erred in failing to instruct the jury that it was required to find one of the statutory aggravating factors

before awarding punitive damages. As such, we reverse the Court of Appeals on this issue.

## Conclusion

In summary, we conclude that plaintiff presented sufficient evidence to support a finding of actual malice by clear and convincing evidence and that the trial court did not err in denying defendants' motions for directed verdict and JNOV. Further, the trial court did not err in instructing the jury on the issue of falsity. We affirm the decision of the Court of Appeals with respect to these issues. However, the trial court erred in failing to instruct the jury that it was required to find one of the statutory aggravating factors before awarding punitive damages pursuant to N.C.G.S. § 1D-15(a). As such, we reverse the decision of the Court of Appeals on this issue and remand to that court for further remand to the trial court for a new trial on punitive damages only.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.